## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **ALFRED T. GIULIANO, as Chapter 7 Trustee for the jointly administered Chapter 7 estates of Debtors DSI Renal Holdings LLC, DSI Hospitals, Inc., and, DSI Facility Development, LLC,** | **CIVIL ACTION NO. ____** |
| **Plaintiff,** | |
| **v.** | |
| **CDSI I HOLDING COMPANY, INC., CDSI II HOLDING COMPANY, INC., MICHAEL SCHNABEL, BRUCE POLLACK, LEIF MURPHY, ROBERT BERGMANN, KEN KENCEL, JAY YALOWITZ, CENTRE PARTNERS MANAGEMENT LLC, CENTRE BREGAL PARTNERS, L.P., CENTRE CAPITAL INVESTORS IV, L.P., CENTRE CAPITAL NON-QUALIFIED INVESTORS IV, L.P., CENTRE PARTNERS COINVESTMENT IV, L.P., CENTRE PARTNERS IV L.P., CENTRE PARTNERS IV LLC, CENTRE PARTNERS COINVESTMENT V, L.P., CENTRE CAPITAL INVESTORS V, L.P., CENTRE CAPITAL NON-QUALIFIED INVESTORS V, L.P., CENTRE BREGAL PARTNERS II, L.P., CENTRE PARTNERS V L.P., CENTRE PARTNERS V LLC, THE NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY, THE NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY FOR ITS GROUP ANNUITY SEPARATE ACCOUNT, APOLLO INVESTMENT CORPORATION, and, ARES CAPITAL CORPORATION,** | **JURY TRIAL DEMANDED** |
| **Defendants.** | |

## COMPLAINT

## I.  INTRODUCTION

1.      Plaintiff Alfred T. Giuliano, the Chapter 7 Trustee (the "Trustee") for the jointly administered Chapter 7 estates of Debtors DSI Renal Holdings LLC, DSI Hospitals, Inc., and DSI Facility Development, LLC (collectively, the 'Debtors"), by and through his counsel, brings this action, *inter alia*: (a) to avoid as fraudulent transfers various transactions, transfers and agreements executed and implemented in connection with (i) the January 11, 2010 global restructuring (the "DSI Restructuring") of the Debtors and their affiliates, including operating subsidiary DSI Renal, Inc. ("DSI Renal"),[1] and, (ii) the February 2011 sale of DSI Renal to DaVita, Inc. ("DaVita") for more than $700 million (the "DaVita Merger Transaction"); and (b) to recover in excess of $425 million from the Defendants who include transferees of the fraudulent transfers, officers, directors and/or controlling shareholders who orchestrated, implemented and profited from the wrongdoing alleged herein, and aiders and abetters of the wrongdoing of others.

2.      In short, the DSI Restructuring was part of an unlawful scheme to strip out substantially all of the assets of Debtor DSI Renal Holdings LLC for the benefit of the Debtors' largest shareholders and largest insider creditors and to shield the Debtors' assets from the claims of more than 200 of the Debtors' outside creditors that the insiders wished to avoid.

---

[1]      DSI Renal was the most valuable of the Debtors' companies.  It was that entity which owned and operated more than 100 outpatient dialysis clinics and provided services to acute care facilities.

2

## II.    JURISDICTION AND VENUE

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1334, since the litigation arises under Title 11 (the Bankruptcy Code), or in or related to cases under Title 11.

4.      The Trustee demands a jury trial before an Article III judge in connection with all claims asserted herein, and the Trustee does <u>not</u> consent to the entry of final judgment or adjudication by a bankruptcy judge.

5.      Venue is appropriate in this District pursuant to 28 U.S.C. § 1409(c).

## III.    PARTIES

### The Plaintiff

6.      Plaintiff Alfred T. Giuliano is the Chapter 7 Trustee for the jointly administered Chapter 7 bankruptcy estates of Debtors DSI Renal Holdings LLC ("DSI Renal Holdings"), DSI Hospitals, Inc. ("DSI Hospitals"), and, DSI Facility Development, LLC ("DSI Facility"), which on June 3, 2011 (the "Petition Date"), filed voluntary petitions for relief under Chapter 7 of Title 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware, with the cases being jointly administered under the caption, *In re DSI Renal Holdings LLC*, *et al.* U.S.B.C. D. Del., Case No. 11-11722 (KJC).

7.      On the Petition Date: DSI Renal Holdings was a Delaware limited liability company; DSI Hospitals was a Delaware corporation; and, DSI Facility was a Delaware limited liability company.  Prior to the Petition Date – and in connection with the DSI Restructuring described in detail *infra* – the Debtors' ultimate parent, DSI Holding Company, Inc. ("DSI

Holding Company"), a Delaware corporation, was merged into Debtor DSI Renal Holdings, with

DSI Renal Holdings as the surviving company.

## The Defendants

### The New Holding Company Defendants

8.      Defendant CDSI I Holding Company, Inc. ("CDSI I") is a Delaware corporation

with a registered office for service of process at 2711 Centerville Road, Suite 400, Wilmington,

Delaware 19808. CDSI I was formed on or about December 29, 2009 for the purpose of

effectuating the DSI Restructuring and the fraudulent transfers that occurred in connection

therewith. At all times material hereto: Defendant Murphy was the President and Chief

Executive Officer of CDSI I; Defendant Yalowitz was the Secretary of CDSI I; and, Defendants

Murphy, Schnabel and Pollack were members of the board of directors of CDSI I.

9.      Defendant CDSI II Holding Company, Inc. ("CDSI II") is a Delaware corporation

with a registered office for service of process at 2711 Centerville Road, Suite 400, Wilmington,

Delaware 19808. CDSI II was formed on or about December 29, 2009 for the purpose of

effectuating the DSI Restructuring and the fraudulent transfers that occurred in connection

therewith. At all times material hereto: Defendant Murphy was the President and Chief

Executive Officer of CDSI II; Defendant Yalowitz was the Secretary of CDSI II; and, Defendants

Murphy, Schnabel and Pollack were members of the board of directors of CDSI II.

### The Director and Officer Defendants

10.      Defendant Michael Schnabel ("Schnabel") is an individual with a place of

business at 825 Third Avenue, New York, NY 10022. At all times material hereto, Defendant

Schnabel was an insider of the Centre Partners Defendants, a director of DSI Holding Company

4

(i.e., the transferor of the fraudulent transfers effectuated through the DSI Restructuring), a director of Debtor DSI Hospitals and a director of DSI Renal.

11.     Defendant Bruce Pollack ("Pollack") is an individual with a place of business at 825 Third Avenue, New York, NY 10022.  At all times material hereto, Defendant Pollack was an insider of the Centre Partners Defendants, a director of DSI Holding Company, a director of Debtor DSI Hospitals, and a director of DSI Renal.

12.     Defendant Leif Murphy ("Murphy") is an individual who resides at 4909 Maymanor Circle, Nashville, TN 37205.  At all times material hereto, Murphy was a director and the president of DSI Holding Company, Debtor DSI Hospitals, and DSI Renal.

13.     Defendant Robert Bergmann ("Bergmann") is an individual who resides at 13600 Romany Drive, Pacific Palisades, CA 90272.  At times material hereto, Defendant Bergmann was a director of DSI Holding Company, a director of Debtor DSI Hospitals, and a director of DSI Renal.

14.     Defendant Ken Kencel ("Kencel") is an individual who resides at 190 North Street, Greenwich, CT 06830.  At times material hereto, Defendant Kencel was a director of DSI Holding Company, a director of Debtor DSI Hospitals, and a director of DSI Renal.

15.     Defendant Jay Yalowitz ("Yalowitz") is an individual who resides at 1700 Stokes Lane, Nashville, TN 37215.  At all times material hereto, Defendant Yalowitz was the secretary and general counsel of DSI Holding Company, the secretary of Debtor DSI Hospitals, and the secretary of DSI Renal.  Defendants Schnabel, Pollack, Murphy, Bergmann, Kencel and Yalowitz are referred to collectively in this Complaint as the "Director and Officer Defendants."

16.     At all times material hereto, the Debtors had no "independent" directors.

5

## The Centre Partners Defendants

17.     Defendant Centre Partners Management LLC ("CPM") is a limited liability company and private equity firm with a place of business at 825 Third Avenue, New York, NY 10022.   At all times material hereto, CPM managed the Centre Partners affiliates' investments in the Debtor.

18.      Defendant Centre Bregal Partners, L.P. ("CBP") is a limited partnership with a place of business at 825 Third Avenue, New York, NY 10022.   At all times material hereto, CBP was a shareholder of Defendant CDSI I and a transferee of the fraudulent transfers identified herein.

19.     Defendant Centre Capital Investors IV, L.P. ("CCI IV") is a limited partnership with a place of business at 825 Third Avenue, New York, NY 10022.   At all times material hereto, CCI IV was a shareholder of Defendant CDSI I and a transferee of the fraudulent transfers identified herein.

20.     Defendant Centre Capital Non-Qualified Investors IV, L.P. ("CCNQ IV") is a limited partnership with a place of business at 825 Third Avenue, New York, NY 10022.   At all times material hereto, CCNQ IV was a shareholder of Defendant CDSI I and a transferee of the fraudulent transfers identified herein.

21.     Defendant Centre Partners Coinvestment IV, L.P. ("CPCI IV") is a limited partnership with a place of business at 825 Third Avenue, New York, NY 10022.   At all times material hereto, CPCI IV was a shareholder of Defendant CDSI I and a transferee of the fraudulent transfers identified herein.

22.     Defendant Center Partners IV L.P. ("CP IV") is a limited partnership with a place of business at 825 Third Avenue, New York, NY 10022.   At all times material hereto, CP IV was the general partner of CBP, CCI IV, CCNQ IV, and CPCI IV.

23.     Defendant Centre Partners IV LLC ("CP IV LLC") is a limited liability company with a place of business at 825 Third Avenue, New York, NY 10022.  At all times material hereto, CP IV LLC was the general partner of Defendant CP IV and Defendant Bruce Pollack was the managing partner of CP IV LLC.

24.     Defendant Centre Partners Coinvestment V, L.P. ("CPCI V") is a limited partnership with a place of business at 825 Third Avenue, New York, NY 10022.   At all times material hereto, CPCI V was a shareholder of Defendant CDSI I and a transferee of the fraudulent transfers identified herein.

25.     Defendant Centre Capital Investors V, L.P. ("CCI V") is a limited partnership with a place of business at 825 Third Avenue, New York, NY 10022.   At all times material hereto, CCI V was a shareholder of Defendant CDSI I and a transferee of the fraudulent transfers identified herein.

26.     Defendant Centre Capital Non-Qualified Investors V, L.P. ("CCNQ V") is a limited partnership with a place of business at 825 Third Avenue, New York, NY 10022.   At all times material hereto, CCNQ V was a shareholder of Defendant CDSI I and a transferee of the fraudulent transfers identified herein.

27.     Defendant Centre Bregal Partners II, L.P. ("CBP II") is a limited partnership with a place of business at 825 Third Avenue, New York, NY 10022.   At all times material hereto,

CBP II was a shareholder of Defendant CDSI I and a transferee of the fraudulent transfers identified herein.

28.     Defendant Centre Partners V L.P. ("CP V") is a limited partnership with a place of business at 825 Third Avenue, New York, NY 10022.  At all times material hereto, CP V was the general partner of CPCI V, CCI V, CCNQ V, and CBP II.

29.     Defendant Centre Partners V LLC  ("CP V LLC") is a limited liability company with a place of business at 825 Third Avenue, New York, NY 10022.  At all times material hereto, CP V LLC was the general partner of Defendant CP V and Defendant Bruce Pollack was the managing partner of CP V LLC.   Defendants CPM, CBP, CCI IV, CCNQ IV, CPCI IV, CP IV, CP IV LLC, CPCI V, CCI V, CCNQ V, CBP II, CP V, and CP V LLC are referred to collectively in this Complaint as the "Centre Partners Defendants."

30.     At all times material hereto, the Centre Partner Defendants were controlling shareholders/owners of the DSI Holding Company and the Debtors, controlling four of the five seats on the boards of directors.

### The Northwestern Mutual Life Defendants

31.     Defendant The Northwestern Mutual Life Insurance Company ("NML") is a Wisconsin corporation with a place of business at 720 East Wisconsin Avenue, Milwaukee, Wisconsin 53202.  At all times material hereto, NML was a shareholder of Defendant CDSI I and a transferee of the fraudulent transfers identified herein.

32.     Defendant The Northwestern Mutual Life Insurance Company For Its Group Annuity Separate Account ("NML GA") is a Wisconsin corporation with a place of business at 720 East Wisconsin Avenue, Milwaukee, Wisconsin 53202.  At all times material hereto, NML

GA was a shareholder of Defendant CDSI I and a transferee of the fraudulent transfers identified herein. Defendants NML and NML GA are referred to collectively in this Complaint as the "Northwestern Mutual Life Defendants."

### Other Defendants

33.     Defendant Apollo Investment Corporation ("Apollo") is a Maryland corporation with a place of business at 9 West 57th Street, New York, NY 10019. At all times material hereto, Apollo was a shareholder of Defendant CDSI I and a transferee of the fraudulent transfers identified herein.

34.     Defendant Ares Capital Corporation ("Ares") is a Maryland corporation with a place of business at 245 Park Avenue, 44th Floor, New York, NY 10167. At all times material hereto, Ares was a shareholder of Defendant CDSI I and a transferee of the fraudulent transfers identified herein.

## IV.     FACTS

35.     The Debtors are the empty shells of a healthcare conglomerate that once comprised more than 25 companies.

36.     Through its operating subsidiaries – and in particular operating subsidiary DSI Renal – Debtor DSI Renal Holdings LLC was the fifth largest provider of outpatient dialysis clinics in the United States, owning and operating 106 clinics and providing services to 26 acute care facilities. As of October 31, 2009, the Debtors' clinics treated approximately 7,800 patients in 23 states and generated annual revenues of approximately $350 million.

37. For the year ending December 31, 2008, however, the Debtors – who at all times material hereto had filed consolidated tax returns – suffered a write-down of more than $100 million in the value of accounts receivable.

38. In or around October, 2008, Defendant Murphy was hired to replace the then CEO – who was deemed responsible for the financial missteps that had caused the write-down – and to implement a turnaround plan.

39. One of the Debtors' operating subsidiaries – Bucks County Oncoplastic Institute LLC (the "Bucks County Hospital" or "Bucks County") – owned a specialty breast cancer treatment institute in Bucks County, Pennsylvania.

40. The Bucks County Hospital was never profitable or cashflow positive. Rather, it incurred tens of millions of dollars of losses from its inception through its closing.

41. Shortly after he was hired, Defendant Murphy recommended the closure of the Bucks County Hospital.

42. When it shut down on or around February 4, 2009, the Bucks County Hospital owed almost forty million dollars to more than 200 creditors – many of whom reside in the Eastern District of Pennsylvania.

43. At all times material hereto, Debtor DSI Renal Holdings/DSI Holding Company was liable for the debts of its operating subsidiary the Bucks County Hospital because, among other reasons: (a) the Debtor had guaranteed Bucks County Hospital debt; (b) from 2005 when the Bucks County Hospital was being developed, through early 2009, when it was being shut down, the thousands of purchase orders issued to vendors who provided goods and services to the Bucks County Hospital were issued not by the Bucks County Hospital, but by and under the

name of Debtor DSI Renal Holdings/DSI Holding Company;[2] (c) the Bucks County Hospital's bills were routinely paid by Debtor DSI Renal Holdings/DSI Holding Company and affiliate DSI Renal; (d) the Debtors' personnel had controlled the Bucks County Hospital; (e) the Bucks County Hospital's funds were co-mingled with funds of the Debtor and its affiliates; and, (f) corporate distinctions were not observed as between the ultimate parent, i.e., the Debtors and their operating subsidiary, i.e., the Bucks County Hospital, rendering the Debtors liable as the alter ego of the Bucks County Hospital and the Debtors' other affiliates.

44.     Based on the Trustee's review of the books and records of the Debtors and their subsidiaries, the companies were operated as a single entity, with millions of dollars having been routinely transferred between and among the companies to fund the cash needs of the day, without regard to which company generated the cash or which company incurred the expense being paid.  As confirmed by an email dated April 1, 2010, neither the treasurer nor any other company employee was able to explain the "major swings" in intercompany transfers.

45.     On or about November 10, 2008, the Board of Directors of Debtor DSI Hospitals authorized the closure of the Bucks County Hospital and the commencement of bankruptcy proceedings on behalf of the Bucks County Hospital depending on the success of negotiations with creditor MPT of Bucks County, LP ("MPT"), a secured creditor of the Bucks County Hospital, whose debt was in part guaranteed by Debtor DSI Renal Holdings/DSI Holding Company.

---

[2]     An April 1, 2010 email from the Bucks County Hospital's bankruptcy counsel to Yalowitz confirms the point: "On our call today I understood you to say that the procurement system was set up such that every PO was designated "Bill to Holdco" (regardless of whether it was a Renal or Hospital purchase.)"

46.     The negotiations with MPT proved unsuccessful and the Bucks County Hospital was closed.

## The Tennessee Bankruptcy Case

47.     In the first part of the unlawful scheme to avoid liability for the debts of the Bucks County Hospital, the Debtors' management/directors caused the Bucks County Hospital to commence a Chapter 7 bankruptcy case in Tennessee on March 30, 2009, captioned, *In re Bucks County Oncoplastic Institute, LLC, Debtor*, U.S.B.C. M.D. Tenn., Case No. 3:09-bk-03570 (the "Tennessee Bankruptcy Case").

48.     As reflected on the schedules filed by the debtor in the Tennessee Bankruptcy Case, which were verified by Defendant Yalowitz, the Bucks County Hospital owed in excess of $36 million to more than 200 creditors who resided in and/or who provided goods/services to the Bucks County Hospital in the Eastern District of Pennsylvania.

49.     The bankruptcy schedules filed in the Tennessee Bankruptcy Case were materially false, and that material falsity was intentional.

50.     In numerous *internal* documents, DSI Holding Company (which merged into Debtor DSI Renal Holdings in connection with the DSI Restructuring) admitted its liability to numerous creditors of the Bucks County Hospital, yet, in most instances, the Debtor's status as "codebtor" for the Bucks County Hospital was omitted from the schedules and the Tennessee Bankruptcy Case was closed without that status ever having been revealed.

51.     By omitting DSI Holding Company as a codebtor, company insiders diminished the likelihood that the Bucks County Hospital's creditors would commence litigation or take other action, such as the commencement of an involuntary bankruptcy proceeding against DSI

12

Holding Company, which would have torpedoed the contemplated restructuring and other transactions.

52.     An email dated September 25, 2009, from Defendant Yalowitz (the company's former general counsel) to Defendant Murphy (the company's former CEO) establishes the point:

> FYI. The Trustee [in the Tennessee Bankruptcy Case] has filed suit against DSI Holding Company seeking recovery of $90,000 in management fees that we received .... In light of what may likely occur with DSI Holding Company I am going to slow walk this and try to drag it out as long as possible.

53.     Similarly, a November 23, 2009 email from the Bucks County Hospital's bankruptcy counsel to Defendant Yalowitz supports the point, and raises serious concerns about the lack of candor in that bankruptcy proceeding:

> Good news: the court simply scheduled another pretrial for February 1 to give the parties time to try to resolve this matter informally. Not so good news: while the court had no problem with our representing DSI [in the defense of preference litigation brought by the Bucks County Chapter 7 Trustee] after having represented Bucks County, she asked that we notify all Bucks County creditors of our joint representation and give them an opportunity to object. **I'm thinking maybe we should wait a few weeks before sending that notice in order to see what happens at the DSI level, because I don't want such a notice to give any more creditors the idea that they can/should sue DSI for Bucks County debt on the theory that they are the same entity.**
> (Emphasis added).

54.     Eventually, the bankruptcy trustee in the Tennessee Bankruptcy Case distributed only $215,000 or so to around forty creditors on account of the initially scheduled claims which had exceeded $36 million.

55.     On or about January 11, 2013 – as a result of the wrongdoing uncovered and identified by the Trustee/Plaintiff – the United States Trustee for the Middle District of Tennessee filed a motion to reopen the Tennessee Bankruptcy Case.

56.     On February 6, 2013, the Tennessee Bankruptcy Court granted the motion and reopened the Tennessee Bankruptcy Case.

### The Stabilization of the Renal Business

57.     Promptly after taking over the management of the Debtors, Defendant Murphy identified and implemented revenue enhancement opportunities (in the form of increased insurance reimbursement from third-party payers), and expense reduction opportunities, the combined effect of which effectuated a dramatic turnaround of the Debtors' business and finances.

58.     In fact, as the Defendants were well-aware, the Debtors' turnaround plan was well on its way to success by June, 2009, with the company having experienced two consecutive quarters of improved financial operations and better than projected revenues and earnings.

59.     Shortly after the turn-around plan had been implemented, management projected – and the Officer and Director Defendants expected – that operational and financial performance would continue to improve through the end of the year and beyond, with 2009 earnings then projected at between $56 - $61 million.

**The Insider Defendants Conducted a Half-hearted Sale Process as Cover
for Their Unlawful Scheme to Strip Out Substantially all of the Assets of
Debtor DSI Renal Holdings LLC for the Benefit of the Defendants**

60.     As part of a ruse to appease the lenders and to establish a suppressed "restructure valuation" to the detriment of certain shareholders and all of the Debtors' non-insider creditors, the Debtor engaged Goldman Sachs to solicit outside interest in acquiring the companies.

61.     On or before June, 4, 2009 – before the first outside bid had been received – the Debtor had engaged outside counsel to effectuate a restructuring.

62.     In reality, the sale effort was designed and effectuated to suppress outside investor interest, in a effort to afford the Centre Partners Defendants and the Northwestern Mutual Life Defendants the opportunity to wipe out the Debtor's ownership of and to acquire for themselves a majority interest in DSI Renal.

63.     Indeed, when DaVita made an offer to purchase the Debtor's DSI Renal business on August 5, 2009, Defendant Murphy commented, "This just in. Pathetic offer – I couldn't be happier!"

64.     The Goldman Sachs sale process resulted in several low-ball offers because they were based on limited financial information from the pre-turnaround period, rather than on the improved revenues and earnings that the Debtors were then experiencing and which were projected by company insiders to continue and improve over the next year.

65.     As admitted in an internal memorandum of the Northwestern Mutual Life Defendants dated September 17, 2009, "The business suffered a material setback in 2008 due to operational mis-steps by the prior CEO.  A strong turnaround is underway." (emphasis in original).

66.     Although the Centre Partners Defendants and the Northwestern Mutual Life Defendants determined that the offers obtained in the initial phase of the Goldman Sachs sale process had "failed to produce fair value" for the Debtor, the Director and Officer Defendants prematurely terminated the sale process at the direction of the Centre Partners Defendants.

67.     As the Director and Officer Defendants, the Centre Partners Defendants, the Northwestern Mutual Life Defendants and perhaps other Defendants were aware, had the Debtor deferred the sale process until the end of the year or into the next, the valuations of interested outsiders would have been based on the company's rapidly improving, current financial results, and the interest and arms-length offers of outsiders would have increased dramatically.

68.     In fact, DaVita, who ultimately purchased the restructured company for more than $700 million, expressed a willingness to increase its offer in the fall of 2009, yet was completely rebuffed.

69.     Motivated by a desire to effectuate certain insiders' ability to "purchase" the company at a distressed/lowball value – rather than at a price consistent with their fiduciary duty to maximize value for the benefit of all company shareholders and creditors – the Director and Officer Defendants, the Centre Partners Defendants, the Northwestern Mutual Life Defendants and perhaps other Defendants successfully pushed to accelerate and close the DSI Restructuring.

70.     While the low-ball offers from outsiders were properly rejected, they were then improperly used by the Director and Officer Defendants, the Centre Partners Defendants, the Northwestern Mutual Life Defendants and other Defendants as cover to justify the low-ball valuation upon which the DSI Restructuring was based.

**The Insider Defendants Effectuated the Fraudulent Transfer of DSI Renal
Through the DSI Restructuring and the Subsequent Sale to DaVita –
all to the Substantial Detriment of the Debtors' Non-insider Creditors.**

71.     At a joint meeting of the board of directors of DSI Holding Company and DSI
Renal held on September 14, 2009, the Director Defendants voted to terminate the Goldman
Sachs sale process, to not provide any additional information to bidders, and to, instead, pursue a
restructuring of the company.

72.     At a joint meeting of the board of directors of DSI Holding Company and DSI
Renal held on January 6, 2010, the Director Defendants approved the DSI Restructuring.

73.     The DSI Restructuring, which closed on January 11, 2010, was part of an
unlawful scheme to strip out substantially all of the assets of the Debtor for the benefit of the
Company's largest shareholders and largest insider creditors – including the Centre Partners
Defendants, the Northwestern Mutual Life Defendants, Ares and Apollo – and to shield the
Debtors' assets from the claims of the many outside creditors that the insiders wished to avoid.

74.     Developed by the Centre Partners Defendants – who at the time owned 46% of the
stock of Debtor DSI Renal Holdings/DSI Holding Company and controlled a majority of the
boards of the Debtors and their subsidiaries – the scheme involved:

(a)     the formation of two new holding companies – i.e., Defendants CDSI I and CDSI
II – approximately 90% of whose stock was issued to the Debtor's largest shareholders (i.e., the
Centre Partners Defendants who were issued 49.1% of the stock, the Northwestern Mutual Life
Defendants who were issued 19.8% of the stock, Ares who was issued 14.3% of the stock, and

Apollo who was issued 6.7% of the stock), while 10% of the stock was issued to the Debtor's other shareholders;[3] and,

      (b)    the transfers by Debtor DSI Renal Holdings/DSI Holding Company of: (i) the Debtor's 100% ownership interest in DSI Renal; (ii) $250 million of net operating loss carry forwards; (iii) the Debtor's management contracts and upper-management team; and, (iv) fixed assets (e.g., desks, computers, furniture, etc.) and certain receivables. In return for these transfers, the Debtor received one share of stock in CDSI I, an insignificant amount of cash and relief from certain liabilities to insiders with the ability to interfere with the proposed transaction (and who had expressed an intention to do so).

      75.    As part of their fraudulent effort to wipe out the Debtors' equity interest in DSI Renal and to avoid obligations to the Debtors' non-insider creditors, the Defendants had placed a low-ball value on the restructured company of $477.7 million, when in fact the fair market value of the company as of the date of the DSI Restructuring exceeded $650 million and was increasing each day.

      76.    When questioned under oath as to how the restructured value had been determined, Defendant Schnabel admitted that it was not based on an appraisal or outside

---

[3]    Among the common shareholders of DSI Holding Company were approximately thirty individuals/entities who received nominal shares in CDSI I. These shareholders played no active role in the DSI Restructuring and many were either unaware of it in real time or were erroneously told by Defendant Murphy and others that their DSI Holding Company equity was worthless. To the extent these shareholders received payment for their shares of CDSI I as a result of the DaVita Merger Transaction, they received substantially less than they would have received had the wrongdoing alleged herein not occurred. To the extent that these shareholders were unaware of the Defendants' wrongdoing, they were themselves victims of the Defendants' fraudulent schemes. The damages to innocent shareholders have yet to be fully ascertained but likely exceed $10 million.

opinion as to the fair market value of the business, but, rather, was based solely on the debt associated with the continued operation of the DSI Renal business and the restructuring transaction costs.

77. In this regard, Defendant Schnabel testified:

Q. So, the ... restructuring value for purposes of moving forward was determined by the amount that would be required to pay the debt of the Renal Business and the transaction costs [?]

A. Correct.

78. In fact, a September 30, 2009 pre-restructuring internal valuation of the Centre Partners Defendants had valued the restructured company at approximately $562 million, $30 million dollars greater than a similar internal valuation just three months earlier, and an amount sufficient to have paid the Debtors' creditors in full.

79. When the company's former CEO and one of its consulting surgeons expressed the view that the company was worth $632 million and threatened to derail the DSI Restructuring, the Director and Officer Defendants caused them to receive consideration worth approximately two million dollars, in return for their "cooperation" with the restructuring transaction.

80. As a result of the DSI Restructuring, the Debtor went from owning 100% of the stock of DSI Renal, to owning less than one-thousandth of a percent of the stock of CDSI I, i.e., 1 share out of a total of 138,154.275 shares.

81. In an effort to "persuade" the other shareholders to refrain from interfering or challenging the DSI Restructuring, all of the former shareholders of the Debtor were granted shares of CDSI I – albeit diluted from their share ownership in the Debtor – without such

shareholders having to pay any money or contribute any other consideration for the issuance of said stock.

82. In addition to receiving shares of CDSI I in connection with the DSI Restructuring, the Centre Partners Defendants, Apollo, Ares, and the Northwestern Mutual Life Defendants held DSI related debt. They approved the DSI Restructuring with knowledge of its fraudulent intent, and received fraudulent transfers in connection with that debt.

83. A diagram of the Debtors' pre-restructuring corporate structure is set forth below:



84.   Diagrams of the seven steps of the DSI Restructuring are set forth below:







### Step 3a: Investors Acquire Interests in New Issuer

\* Simultaneous with Steps 3b and 3c, Investors subscribe for the following, for $71,000,000: 76,864.529 common shares in New Issuer; 2,815.318 warrant shares; and 4,222.980 contingent value rights (CVRs)



### Step 3b: DSI Renal Holdings LLC Contributes Shares of DSI Renal, Inc. to New Issuer

\* Simultaneous with Steps 3a and 3c, DSI Renal Holdings LLC contributes its interest in DSI Renal, Inc. to New Issuer



**Step 3c: Creditors Contribute Shares of DSI Renal, Inc. to New Issuer**

\* Simultaneous with Steps 3a and 3b, Creditors contribute 55,095,880 shares of DSI Renal, Inc. to New Issuer for 59,646,745 shares; 2,184,682 warrant shares; and 3,277,020 CVRs



**Step 4: New Issuer Contributes Cash and Shares of DSI Renal, Inc. to New Guarantor**

\* New Issuer contributes cash from Step 3a and shares of DSI Renal, Inc. from Steps 3b and 3c to New Guarantor

New Guarantor contributes cash to DSI Renal, Inc.

7



**Step 5:  Investors & Creditors Transfer Certain Rights**



**Step 6: Management Incentive Plan Adopted**



85.    A diagram of the post-restructuring corporate structure is set forth below:



86.     Although the DSI Restructuring was effectuated through a complex series of agreements, transfers and transactions, the resultant harm to the Debtors and their disadvantaged creditors is quite simple to describe:

    a.    At the conclusion of the DSI Restructuring, the Debtors were left as insolvent shells, with liabilities in excess of $40 million and assets as low as $300,000; and,

    b.    Upon the closing of the DaVita Merger Transaction, the Debtors remained in the same insolvent position, while the Defendants shared more than $425 million.[4]

87.     In connection with the DSI Restructuring, which closed on or about January 11, 2010, and, in connection with the DaVita Merger Transaction, which closed on or about September 6, 2011, the Defendants received the following transfers (individually, a "Transfer" and collectively, the "Transfers"), each of which the Trustee seeks to avoid and recover in this litigation:

### (1)    Transfers of Stock in CDSI I

| Transferee | Shares | Shares (Total) | % Of Shares |
|---|---|---|---|
| Centre Bregal Partners, L.P. | 41,964.596 | | |
| Centre Capital Investors IV, L.P. | 6,604.411 | | |
| Centre Capital Non Qualified Investors, IV, L.P. | 1,252.674 | | |
| Centre Partners Coinvestment, IV, L.P. | 515.722 | | |
| Centre Partners Coinvestment, V, L.P. | 304.382 | | |
| Centre Capital Investors, V, L.P. | 9,799.789 | | |
| Centre Capital Non Qualified Investors, V, L.P. | 1,499.190 | | |

---

[4]     The Trustee asserts no claims against DaVita and does not seek to avoid DaVita's purchase of the Debtors' operating subsidiaries (including DSI Renal).

26

| | | | |
|---|---|---|---|
| Centre Bregal Partners, II, L.P. | 5,896.640 | | |
| Centre Partners Defendants (Combined) | | 67,837.404 | 49.1 |
| Northwestern Mutual Life Insurance Co. | 25,683.424 | | |
| Northwestern Mutual Life Insurance Co. [Group Annuity Separate Account] | 1,604.642 | | |
| Northwestern Mutual Life Defendants (Combined) | | 27,288.066 | 19.8 |
| Ares Capital Corporation | | 19,726.053 | 14.3 |
| Apollo Investment Corporation | | 9303.034 | 6.7 |
| Leif Murphy | | 1,000 | 0.7 |
| Jay Yalowitz | | 135 | 0.1 |
| Ken Kencel | | 56.430 | < 0.1 |
| Robert Bergmann | | Unknown | Unknown |
| Michael Schnabel | | Unknown | Unknown |
| Bruce Pollack | | Unknown | Unknown |

**(2)** **Funds Received From DaVita Merger Transaction[5]**

| Transferee | Amount |
|---|---|
| Centre Bregal Partners, LP | $ 95,938,972.87 |
| Centre Capital Investors IV, LP | $ 15,098,927.86 |
| Centre Capital Non Qualified Investors IV, LP | $ 2,863,848.77 |
| Centre Partners Coinvestment IV, LP | $ 1,179,037.66 |
| Centre Partners Coinvestment V, LP | $ 695,874.60 |
| Centre Capital Investors V, LP | $ 22,404,164.00 |
| Centre Capital Non Qualified Investors V, LP | $ 3,427,430.80 |
| Centre Bregal Partners II, LP | $ 13,480,830.00 |
| Centre Partners | $ 6,892,000.00 |
| **Centre Partners Defendants (Combined)** | **$161,981,086.56** |
| Northwestern Mutual Life Insurance | $ 82,417,741.57 |

---

[5]     Includes transfers on account of equity, debt and expenses.

| | |
|---|---|
| Northwestern Mutual Life Insurance (GASA Account) | $  9,260,639.49 |
| **Northwestern Mutual Life Defendants (Combined)** | **$  91,678,381.06** |
| Ares Capital Corporation | $117,327,092.61 |
| Apollo Investment Corporation | $  41,125,180.56 |
| Leif Murphy | $  12,384,439.59 |
| Jay Yalowitz | $    1,846,500.04 |
| Ken Kencel | $        119,990.48 |
| Robert Bergmann | Unknown |
| Michael Schnabel | Unknown |
| Bruce Pollack | Unknown |

88.     The Transfers made by Debtor DSI Renal Holdings/DSI Holding Company in connection with the DSI Restructuring were made with the actual intent to hinder, defraud and delay the Debtors' more than 200 non-insider creditors, including the creditors who provided goods and services to the Bucks County Hospital pursuant to purchase orders issued by and in the name of Debtor DSI Holding Company/DSI Renal Holdings.

89.     That the Transfers made by the Debtor in connection with the DSI Restructuring were made with the actual intent to hinder, defraud and delay the Debtors' non-insider creditors is *admitted* repeatedly in: (a) numerous documents now in the possession of the Trustee, including company board minutes, internal and external company emails, insider emails, and internal notes and emails of the Debtors' prior counsel; and, (b) sworn deposition testimony taken in connection with the Trustee's investigation and examinations under Rule 2004 of the Federal Rules of Bankruptcy Procedure, including those of: (i) the Debtor's former outside counsel; (ii) Defendant Murphy; (iii) Defendant Yalowitz; and, (iv) Defendant Schnabel.

90.     For example, the following documents speak volumes as to the Debtor's fraudulent intent:

a.     a September 2, 2009 email from one of the senior attorneys on the Debtor's

restructuring team provides in pertinent part:

> … we understand that DSI Holding [the Debtor] has guaranteed obligations of Bucks County Oncoplastic Institute LLC (an indirect sub of DSI Holding...) under certain equipment leases, etc. for a total of approx. $8M….
>
> To get around these guarantee obligations, Centre and a subset of existing DSI investors are contemplating putting funds into a new entity….

    b.    a September 9, 2009 email from the Debtor's CEO/board member provides a "Situation Overview" and identifies the "Issues/Objectives" of the proposed restructuring in pertinent part, as follows:

> Situation Overview:
>
> \*    \*    \*
>
> »    DSI Holdings has between $7 - $9 million in guarantees payable to third party lenders to its former hospital subsidiary. No capital is available at the Holdings level to satisfy the guarantees and the restricted payment provisions in Renal's credit agreements prevent it from upstreaming capital from the Renal sub to fund the obligations.
>
> \*    \*    \*
>
> ISSUES/OBJECTIVES
>
> 1)    In the likely event that the Restructuring prevails [over the proposed sale to a third party], what is the best way for Centre Partners to invest the new capital into DSI, Renal? Goals include:
>
> a.    Preserve the value of the NOLs at Renal, Inc.
>
> \*    \*    \*
>
> c.    Protect the new capital from guarantor claims against Holdings.

c.    a September 20, 2009 memo from the Debtor's CEO/board member – responding

to questions from an equity holder who had expressed suspicion as to the reason for the proposed

restructuring – provides in pertinent part:

> •    There are $7 - 9mm in guaranties to Siemens and MPT.
> The range is dependent upon whether or not certain Buck's
> creditors are able to upstream their liabilities to Holdings [the
> Debtor].  Prior to October 2008, all of the Buck's [County] Pos
> were issued under Holdings name, making it possible for a number
> of the Buck's creditors to attempt to look to Holdings for
> satisfaction of the invoice amounts.

d.    a September 29, 2009 email from the Debtor's lead restructuring counsel provides:

> Centre wants to liquidate just the holding company [the Debtor],
> and do their new equity investment at a level below that, wiping
> out the claims of the creditors at holdings [the Debtor] and thru the
> investment wiping out the equity interest of holdings [the Debtor]
> in renal [DSI Renal].

e.    an October 1, 2009 email between Debtor's counsel provides:

> ...[lead  restructuring counsel] wants us to call the GC of DSI today
> to cover contracts, assets and in particular which liabilities exist at
> DSI Holding that they are looking to get rid of.

f.    an October 2, 2009 email between the Debtor's counsel highlights the risk in the

event that a bankruptcy was commenced before the contemplated restructuring was completed:

> To be clear, any equity that resides at DSI Renal and below would
> become an asset in any Holdings' bankruptcy.  Putting on my
> chapter 7 trustee cap, I would probably (i) order a valuation of the
> full enterprise, (ii) consider an auction to sell the equity interests,
> and (iii) investigate any and all claims/causes of action against
> Holdings' [directors and officers] like bad faith filing, breach of
> fiduciary duty (perhaps to tap into the D&O policy that resides at
> Holdings as a source to fund recoveries to creditors).

g.    an October 2, 2009 email between the Debtor's counsel discusses the statutes of

limitations for avoiding and recovering preferences and fraudulent transfers under the bankruptcy code and state law.

h.    an October 16, 2009 email exchange between the Debtor's former outside auditor, KPMG, and its former treasurer, provides:

> [the former outside auditor]
>
> We ran some scenarios with the new restructuring information. Subject to several caveats, the wiggle room is now looking like $40-50MM. One sticking point: early in our discussions, someone mentioned that there was some debt at the DSI Holding level (I want to say guarantees of some loans) and a goal was to avoid using new equity to pay off that debt. Has there been any further discussions about how that may be accomplished?
>
> [the former treasurer]
>
> Right now it appears that we will be forming a new acquisition sub . . . to buy DSI Renal, Inc. We will then shut down the holding company since there are no assets there and only such guarantees. Obviously, it will get more complicated than that and we will get you guys in touch with [outside counsel] as we work through this.

i.    a November 4, 2009 email from Debtor's lead restructuring counsel provides:

> Want to walk thru a recap process we've been working our way thru, board issues/interested directors, but also want to walk thru structure as to how we might effect recap by making new investment below the holding company (where there are a couple of unsecured creditors), make sure we are thinking of all the angles, etc.

j.    a December 2, 2009 email from Debtor's lead restructuring counsel provides:

> …. Think a fairness opinion would help here? I assumed you would never get GS [Goldman Sachs] to say the deal was "fair" to the stockholder of dsi renal [the Debtor] as they are effectively getting wiped out - pretty tough opinion to give.

k.    a December 11, 2009 email exchange between Debtor's restructuring counsel and

31

a litigator member of the team provides:

> [the litigation attorney]
>
> Are there any thoughts of getting the trade creditors (MPC, Siemens) to sign on?
>
> \*　　\*　　\*
>
> [the restructuring attorney]
>
> No one has mentioned getting the trade creditors to sign this - I am not aware of any settlement offers or other talks . . . ongoing with them.

l.　　a December 22, 2009 email from Debtor's lead restructuring counsel provides:

> I don't see how we can have any board other than dsi holding and dsi renal consider and approve these transactions, even though we will need to have the boards of the new entities and renal sign consents to effect portions of the new transactions. Just don't see how we could shield the board members from any potential liability with being cute with some new, smaller board approving. Anyone disagree?

m.　　a January 6, 2010 email from Debtor's restructuring counsel provides:

> ... As you may know, we are trying to close a consensual recap of DSI tomorrow. As such we need to figure out whether DSI Hospitals should be a party to the attached restructuring agrmt or whether due to the Bucks County issue, there are good reasons why we may leave them off....

n.　　The minutes of the December 23, 2009 Joint Meeting of the Board of Directors of the Debtor and DSI Renal provide in pertinent part as follows:

> 2.　　<u>Meeting Overview</u>. Leif Murphy [the CEO and board member] provided an overview of the topics to be discussed during the meeting, including ... the final terms of the restructuring, the benefits and risks to the restructuring ....
>
> \*　　\*　　\*

      6.    <u>Restructuring Process</u>. Leif Murphy then discussed the process by which the restructuring would occur, including the subordinated debt holders exchanging a portion of their notes for equity and a new holding company becoming the primary owner of DSI funded with the new equity and the converted debt, with DSIHC [the Debtor] becoming a minority shareholder in the new holding company [i.e., the Debtor would own 1 share out of a total of 138,154.275 shares].   Mr. Murphy reported that it is anticipated that the restructuring would be effectuated as a consensual transaction with all of the equity holders participating, but that certain of DSIHC's [the Debtor's] creditors (such as MPT, Siemens, Bucks County vendors that had been issued DSIHC purchase orders) could seek to challenge the transaction on the basis of a preference, fraudulent conveyance, breach of fiduciary duty or other theory....

o.    A January 10, 2010 email from Defendant Yalowitz in connection with the

Tennessee Bankruptcy case expresses concern about providing information concerning the DSI

Restructuring to the attorney representing the trustee in the Tennessee Bankruptcy case because:

    ... I don't want to open up a can of worms in terms of him thinking that DSI Holding Company did not get adequate value through this process....

p.    a February 12, 2010 email among Debtor's restructuring counsel provides:

    I'm hoping you can help us think through some of the issues surrounding a possible fraudulent conveyance in a restructuring that was done recently.

q.    An April 15, 2010 email from Defendant Yalowitz to the Bucks County

Hospital's bankruptcy counsel addresses the issue of "offering a settlement now after [a Bucks

County Hospital creditor] raised the corporate veil theory" and provides that "The original plan

was to kill DSI Holding Company but that plan has been put off."

r.    a June 25, 2010 email exchange between the Debtor's former general counsel and

former CEO laments the possible challenge of the DSI Restructuring by a particular creditor:

33

> [former general counsel]
>
> I assume what he means is that they [creditor MPT] might
> challenge the restructuring.
>
> [former CEO]
>
> Yep. Over their guaranty. Seems like a lot to establish for a small
> amount of money [$4 million].
>
> [former general counsel]
>
> Well of course that's the whole reason we did it - spent millions of
> dollars to restructure just to avoid the guaranty.

s.   An August 26, 2010 email from Yalowitz to the Debtor's outside counsel

expresses concern about creditors of the Debtor seeking to recover from DSI Renal on a piercing

the corporate veil theory and wanting to preserve the ability to upstream money from DSI Renal

to the Debtor to hide the reality that the money was coming from DSI Renal:

> We have some situations where Bucks County vendors are seeking
> recovery from DSI Holding Company and DSI Renal (that is DSI
> Renal, Inc. Not DSI Renal Holdings). I wouldn't want to be
> precluded from paying them from DSI Holding so as to keep DSI
> Renal out of it.

t.   An August 26, 2010 email from Yalowitz to the Debtor's outside counsel

similarly provides:

> .... at some point it is possible that we will have DSI Renal fund
> monies up to DSI Holding Company to fund the litigation [against
> the Debtor] (alternatively we may just have DSI Renal directly pay
> some expenses).

91.   Similarly, the following sworn deposition testimony of former company insiders

and counsel speaks volumes as to the Debtor's fraudulent intent and as to CDSI I's and CDSI II's

status as the alter ego and successor of the Debtor:

    a.    The sworn testimony of Defendant Schnabel admits:

    (1)    Q.    ... Why did you create two new companies rather than put the money in the existing corporate structure?

    A.    Because the renal business is where the operations were, where the value was, and that's what we wanted to invest in and that's what we wanted to save.

    Q.    Well, what would happen if you had invested the money in the holding company? How would that have not accomplished the same objective?

    A.    There was no reason to invest in the old holding company anymore. We wanted to invest in the renal business only, not in any of the other operations.

    Q.    Well, there were no other operations at the time other than the renal business. The only operations at the time were the renal business, correct?

    A.    The only operating business at the time was the renal business, correct.

    Q.    So, putting the money in the holding company would benefit the only operating business at the time, correct?

    A.    We felt it was a better structure to invest directly into the renal business.

    Q.    Why?

    *    *    *

    A.    Because we wanted to invest in and save the renal business.

    Q.    Well, was there some reason you didn't want to put money in the holding company? Was there a reason you can think of?

A.   Again, we wanted to invest in and save the renal business and we only wanted the ongoing -- we only wanted the assets and liabilities associated with the ongoing operations of the renal business.

(2)   Q.   Okay.  So, the intent was to isolate the, what you considered to be the assets and liabilities associated with running Renal, and they would stay with the restructured company and everything else would be left behind; is that correct?

A.   Correct.

Q.   And everybody, to your knowledge, all the people involved knew that motivation; is that correct?
[objections omitted]

*       *       *

A.   To my knowledge, yes.

(3)   Q.   Well, let me see if I understand it.  The point was to assume all of the liabilities to people who in the board's judgment would be necessary to run the restructured Renal company; is that right?

A.   Correct.

Q.   And to not assume any ones that you decided were not necessary to operating the restructured Renal business, correct?

A.   Correct.  There was no desire on the part of the new investors or the creditors who were transferring to equity to take on any liabilities that were not associated with the ongoing operations of the Renal business.

b.   The sworn testimony of Defendant Murphy admits:

36

(1) Q. ... the first goal [of the DSI Restructuring] that you identified was to preserve the value of the NOLs at Renal, Inc.; is that correct?

A. That's correct.

Q. Now, that's what we had talked about earlier in terms of taking the NOLs that had been generated at Renal but then resided at the holding company level, moving them back down to the entity that survived after the restructuring, correct?

A. Where they belonged, that's right.

\*  \*  \*

Q. And then the final goal was to protect the new capital from the guarantor claims against Holdings, correct?

A. That's correct.

\*  \*  \*

Q. And the claims, the guarantor claims against Holdings that the goal was to protect the new capital from those guarantor claims, those are the ones we talked about on the prior page which included 7 to 9 million in guarantees to MPT and/or Siemens?

A. That's right.

c. The sworn testimony of one of the Debtor's outside counsel admits:

(1) Q. So, I'm going to ask you the question one more time. Do you recall the motivation for creating new companies in that very complicated restructuring as opposed to merely investing new money in the existing business; do you recall the motivation?

\*  \*  \*

37

Q.     Let me see if I can refresh your
recollection. ....  Now, why don't
you take a moment and read the series of e-mails
which are contained in Exhibit 33 as well as the
attachment entitled DSI structure chart. ...

Q.     ... Now, on September 2, 2009, you
wrote ... and the subject was DSI/Bucks County
entity, correct?

A.     Yes....

Q.     .... And you started out .... "In connection with DSI,
we understand that DSI Holding has guarantee
obligations of Bucks County Oncoplastic Institute,
LLC, an indirect sub of DSI Holding ... under certain
equipment leases, etcetera, for a total of approximately $8 million
being guaranteed under these leases.  Materials
provided to date suggest that this Bucks County
entity filed for Chapter 7 in March 2009," ...
You then wrote the following, "To get around these guarantee
obligations, Centre and a subset of existing DSI
investors are contemplating putting funds into a new
entity that will either be parallel to DSI Holdings
or a new subsidiary of DSI," ....

Q.     ... Does that refresh your recollection as to the
motivation of putting funds into a new entity?

A.     According to this e-mail, that was one of
the motivations.  I don't recall if there were other
reasons why we selected the structure we selected.

(2)     Q.     Well, the goal, was it not, was to put
money in that would not be subject to the claims of
the unsecured creditors at that level, correct?

A.     I'm not sure what the goal was, but looking
at this e-mail, my recollection is that there was a
concern that if we were to put money in at DSI
Holding Company, then the existing trade creditors
would have access to it.

Q.     And there was an effort to avoid that from happening, correct?

A.     I think there were several considerations in structuring the transaction the way we did. That may have been one among several.

Q.     ... [I]t's not a question of may have been, you knew that was one of the considerations, correct?

A.     From what I can remember right now, probably.

Q.     Is that a yes?

A.     That's as far as I can remember right now, yeah.

(3)     Q.     ... What do you recall about the liabilities that were not intended to be paid as part of the restructuring or by the restructured company? Which liabilities were being left behind?

A.     The liabilities to the unsecured creditors.

(4)     Q.     "Mr. Murphy reported [at a board meeting] that it was anticipated that the restructuring would be effectuated as a consensual transaction with all of the equity holders participating." That's, in fact, what happened, correct?

A.     Yes.

Q.     "But that certain of the parent company's creditors (such as MPT, Siemens, Bucks County vendors that had been issued DSIHC purchase orders) could seek to challenge the transaction on the basis of a preference, fraudulent conveyance, breach of fiduciary duty or other theory." And that, those are the types of potential claims that [your law firm] counseled the client about, correct?

A.    Yes.

### The New Holding Companies – Defendants CDSI I and CDSI II – are the Alter Ego and Successor of Debtor DSI Renal Holdings

92.    In connection with the DSI Restructuring, Defendant CDSI I was formed as a new holding company, whose sole purpose was to replace the Debtor as the sole shareholder of the DSI Renal business.

93.    In connection with the DSI Restructuring, Defendant CDSI II was formed as a new holding company, whose sole purpose was to facilitate the restructuring as a new guarantor of DSI Renal debt and to serve as the intermediate holding company of the stock of DSI Renal.

94.    All of the shareholders of the Debtor became shareholders of CDSI I, although the percentage of ownership was manipulated to favor the Centre Partners Defendants, the Northwestern Mutual Life Defendants, Ares and Apollo.

95.    DSI Renal assumed from the Debtor more than 100 employment contracts for the executives/employees whose services were deemed necessary to continue uninterrupted the business of DSI Renal, including those of Defendants Murphy and Yalowitz.

96.    The Debtor transferred to CDSI I all of the fixed assets deemed necessary to continue the DSI Renal business, including desks, computers, cubicles, etc.

97.    The DSI Renal business was continued with the same facilities and employees as existed prior to the DSI Restructuring.

### The Defendants Received More Than $425 Million From the Proceeds of the DaVita Merger Transaction

98.    As confirmed by an internal email from Michael Bay (an officer of the Northwestern Mutual Life Defendants) dated July 27, 2010, within six months of the DSI

40

Restructuring, the Defendants had received an offer of $650 million to purchase the restructured

company, which the insiders rejected as too low. In this regard, Mr. Bay's email provides in

pertinent part as follows:

> Liberty is continuing to pursue dsi and sent a letter to lief
> [Defendant Murphy] and bruce [Defendant Pollack] outlining an
> offer of 650mm. This is clearly too low and will hold out for a
> number higher. I think centre is thinking around 900mm and
> would rather not sell now (I agree)

99.     Within six months of the DSI Restructuring, DaVita again expressed interest in

acquiring the business.

100.     The agreements which effectuated the DaVita Merger Transaction were entered

into on or about February 4, 2011, which ultimately resulted in the sale of the business to DaVita

for more than $700 million.

101.     The conduct of the Defendants, as aforesaid, was intentional, engaged in for an

improper purpose and with a bad motive, and sufficiently outrageous to justify the imposition of

punitive damages.

## V.     THE CLAIMS

### FIRST CLAIM – AVOIDANCE OF TRANSFERS
#### Pursuant to 11 U.S.C. § 548(a)(1)(A)
#### (Against all Defendants)

102.     Paragraphs 1 through 101, above, are incorporated herein by reference, as if

restated in their entirety.

103.     Each Transfer was a "transfer" within the definition of 11 U.S.C. § 101(54)(D)(i)

or (ii).

104.     The Transfers were transfers of property, or of an interest in property, of the

Debtor DSI Renal Holdings to and/or for the benefit of the Defendants.

105.   The Debtor made the Transfers with the actual intent to hinder, delay and/or defraud the Debtor's creditors.

106.   Accordingly, the Transfers constitute avoidable fraudulent transfers pursuant to Section 548(a)(1)(A) of the Bankruptcy Code.

## SECOND CLAIM – AVOIDANCE OF TRANSFERS
### Pursuant to 11 U.S.C. § 548(a)(1)(B)
### (Against all Defendants)

107.   Paragraphs 1 through 106, above, are incorporated herein by reference, as if restated in their entirety.

108.   Each Transfer was a "transfer" within the definition of 11 U.S.C. § 101(54)(D)(i) or (ii).

109.   The Transfers were transfers of property, or an interest in property, of Debtor DSI Renal Holdings to and/or for the benefit of the Defendants at a time when the Debtor was insolvent.

110.   In exchange for the Transfers, Debtor DSI Renal Holdings did not receive reasonably equivalent value.

111.   Accordingly, the Transfers constitute avoidable fraudulent transfers pursuant to Section 548(a)(1)(B) of the Bankruptcy Code.

## THIRD CLAIM – AVOIDANCE OF TRANSFERS
### Pursuant to 6 Del. C. §§ 1304 & 1305, and 11 U.S.C. § 544
### (Against All Defendants)

112.   Paragraphs 1 through 111, above, are incorporated herein by reference, as if restated in their entirety.

113.    At all times material hereto, Debtor DSI Renal Holdings had at least one creditor prior to making the Transfers.

114.    At all times material hereto, Debtor DSI Renal Holdings was insolvent.

115.    Debtor DSI Renal Holdings made the Transfers with the actual intent to hinder, delay and/or defraud the Debtor's creditors.

116.    The Debtor did not receive reasonably equivalent value in exchange for the Transfers.

117.    The Transfers – made when the Debtors were insolvent – constituted fraudulent transfers for which the Defendants are liable.

118.    Accordingly, the Transfers constitute avoidable fraudulent transfers pursuant to 6 Del. C. §§ 1304 and 1305, and Section 544 of the Bankruptcy Code.

## FOURTH CLAIM – RECOVERY OF TRANSFERS UNDER 11 U.S.C. § 550
### (Against all Defendants)

119.    Paragraphs 1 through 118, above, are incorporated herein by reference, as if restated in their entirety.

120.    The Trustee is entitled to avoid the Transfers pursuant to 11 U.S.C. §§ 548 and 544.

121.    The Defendants were the initial transferees of the Transfers, or the entity for whose benefit the Transfers were made or, alternatively, the immediate or mediate transferee of such initial transferee.

122.    Accordingly, the Trustee is entitled to recover the Transfers pursuant to Section 550 of the Bankruptcy Code.

## FIFTH CLAIM – BREACH OF FIDUCIARY DUTY
### (Against the Director and Officer Defendants and the Centre Partners Defendants)

123.    Paragraphs 1 through 122, above, are incorporated herein by reference, as if restated in their entirety.

124.    The Director and Officer Defendants and the Centre Partners Defendants (as controlling shareholders) owed fiduciary duties to the Debtors and to the creditors of those entities as well.

125.    The fiduciary duties included duties of: loyalty; due care; and, good faith.

126.    The duty of loyalty obligates corporate fiduciaries to commit themselves to the business of the corporation with the attitude of promoting the interests of the corporation and not themselves.

127.    The duty of loyalty is breached, *inter alia*: (a) when directors fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities; (b) when directors "abdicate" their directorial responsibilities; and/or (c) when directors act in bad faith.

128.    The duty of due care is breached, *inter alia:* (a) when directors engage in an irrational decisionmaking process; and (b) when the conduct of directors arises to the level of "gross negligence."

129.    A board's failure to inform itself of all material information reasonably available constitutes "gross negligence" and a breach of the duty of due care.

130.    When a board undertakes a sale of the company or a sale of the company's significant assets, the board's conduct is subject to heightened scrutiny and the board's singular

focus must be on seeking and attaining the highest value reasonably available.

131.    Directors are not entitled to protection of the "business judgment rule" when the facts as pleaded stated a plausible claim that, as to the challenged transactions, the director(s) were not disinterested, and/or that they breached any one of the duties of loyalty, due care or good faith.

132.    By engaging in the conduct described above, the Director and Officer Defendants and the Centre Partners Defendants breached their fiduciary duties to the Debtors and their creditors.  The wrongful conduct that resulted in the breach of fiduciary duties included, but was not limited to:

a.    Orchestrating and implementing the DSI Restructuring and the fraudulent Transfers alleged herein as an unlawful scheme to strip out substantially all of the assets of Debtor DSI Renal Holdings for the benefit of the Company's largest shareholders and largest insider creditors and to shield the Debtor's assets from the claims of 200 of the Debtor's outside creditors that the insiders wished to avoid;

b.    Conducting a sham sale process of DSI Renal as cover to justify the low-ball valuation upon which the DSI Restructuring was based;

c.    Filing materially false schedules in the Tennessee Bankruptcy Case and misleading the Court and trustee in that bankruptcy case as to Debtor DSI Renal Holdings' status as co-debtor for the debts of the Bucks County Hospital; and,

d.    Misusing the Tennessee Bankruptcy Case as part of the unlawful scheme to facilitate the DSI Restructuring and the fraudulent Transfers alleged herein.

133.    The conduct of the Director and Officer Defendants and the Centre Partners Defendants, as alleged above, was intentional, reckless, or grossly negligent.

134.   Defendants Murphy and Yalowitz received millions of dollars of bonuses for their roles in facilitating and implementing the DSI Restructuring and DaVita Merger Transaction, and said Defendants should be required to disgorge and repay those bonuses.

135.   As a result of the various breaches of fiduciary duties by the Director and Officer Defendants and the Centre Partners Defendants, the Debtors have suffered damages in an amount to be determined at trial, but which exceed the aggregate value of the fraudulent Transfers, i.e., $425 million.

## SIXTH CLAIM – AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (Against All Defendants)

136.   Paragraphs 1 through 135, above, are incorporated herein by reference, as if restated in their entirety.

137.   To the extent that any Defendant might be found not to have had a fiduciary duty to the Debtors at the time of the transactions complained of herein, each such Defendant is nevertheless liable for having aided and abetted the breach of fiduciary duties by one or more of the other Defendants possessing such duties at the relevant times.

138.   As described in the paragraphs above, each non-fiduciary Defendant substantially assisted, knowingly participated in, benefitted from, and aided and abetted the breaches of fiduciary duties engaged in by the other Defendants.

139.   As a result of this improper conduct, the Debtors have suffered damages in an amount to be determined at trial, but which exceed the aggregate value of the fraudulent Transfers, i.e., $425 million.

## SEVENTH CLAIM – CORPORATE WASTE
**(Against the Director and Officer Defendants and the Centre Partners Defendants)**

140.    Paragraphs 1 through 139, above, are incorporated herein by reference, as if restated in their entirety.

141.    The DSI Restructuring had no rational business purpose and was so commercially unreasonable that no business person of ordinary sound judgment could believe that Debtor DSI Renal Holdings received adequate consideration in exchange for the Transfers.

142.    As a result of the waste of Debtor DSI Renal Holdings' property, the Director and Officer Defendants and the Centre Partners Defendants are responsible for their respective roles and the damages associated therewith.

## EIGHTH CLAIM – DECLARATORY JUDGMENT

143.    Paragraphs 1 through 142, above, are incorporated herein by reference, as if restated in their entirety.

144.    Based on the facts previously set forth, the Trustee is entitled to declaratory relief, including a declaratory judgment (the "Declaratory Judgment") to the effect that: (a) CDSI I and CDSI II were the vehicles used by the Defendants to facilitate the fraudulent Transfer of the Debtor's interest in DSI Renal; (b) Defendants CDSI I and CDSI II are the alter egos and successors of Debtor DSI Renal Holdings/DSI Holding Company; (c) Defendants CDSI I and CDSI II are liable for: (1) all of the debts of Debtors DSI Renal Holdings/DSI Holding Company, DSI Hospitals and DSI Facility; and (2) all of the debts of non-debtor the Bucks County Hosptial; and, (d) Debtor DSI Renal Holdings/DSI Holding Company is liable for all of the debts of Debtors DSI Hospitals and DSI Facility and non-debtor the Bucks County Hospital.

## NINTH CLAIM – EQUITABLE SUBORDINATION UNDER 11 U.S.C. § 510
### (Against All Defendants)

145.     Paragraphs 1 through 144, above, are incorporated herein by reference, as if restated in their entirety.

146.     As a result of the wrongdoing of the Defendants, as aforesaid, any/all claims of the Defendants – including claims heretofore or hereafter filed – against the Debtors should be equitably subordinated below the rights of all other creditors and innocent shareholders of the Debtors, pursuant to 11 U.S.C § 510 of the Bankruptcy Code.

## VI.     RELIEF REQUESTED

WHEREFORE, Plaintiff, Alfred T. Giuliano, Chapter 7 Trustee for the jointly administered estates of Debtors DSI Renal Holdings LLC, DSI Hospitals, Inc., and, DSI Facility Development, LLC, demands judgment in his favor and against the Defendants:

(a)     For avoidance and recovery of the Transfers, or the value thereof;

(b)     Directing Defendants to immediately pay the Trustee the amount of the Transfers, plus interest thereon and costs, and in connection therewith, enter judgment in favor of the Trustee and against:

(1)     Defendants CDSI I and CDSI II, jointly and severally, in an amount in excess of $425 million;

(2)     The Centre Partner Defendants, jointly and severally, in an amount in excess of $162 million;

(3)     The Northwestern Mutual Life Defendants, jointly and severally, in an amount in excess of $92 million;

(4)     Defendant Apollo in an amount in excess of $41 million;

(5)     Defendant Ares in an amount in excess of $117 million;

(6)     Defendant Murphy in an amount in excess of $12 million;

(7)     Defendant Yalowitz in an amount in excess of $1.8 million;

(8)     Defendant Schnabel in an amount to be determined;

(9)     Defendant Pollack in an amount to be determined;

(10)    Defendant Bergmann in an amount to be determined;

(11)    Defendant Kencel in an amount to be determined;

(c)     The entry of judgment in favor of the Trustee and against the Defendants, jointly and severally, for damages in excess of $425 million;

(d)     The entry of the Declaratory Judgment;

(e)     The entry of a judgment granting equitable subordination of the Defendants' potential claims against the Debtors;

(f)     The entry of judgment in favor of the Trustee and against the Defendants, jointly and severally, for punitive damages;

(g)     Reasonable attorneys' fees and costs; and

(h)     Such additional relief as this Court deems just.

## VII.    **JURY DEMAND**

The Trustee demands a jury trial before an Article III Judge in connection with all claims asserted herein.

KAUFMAN, COREN & RESS, P.C.

STEVEN M. COREN
BENJAMIN M. MATHER
ANDREW J. BELLI
Two Commerce Square, Suite 3900
2001 Market Street
Philadelphia, PA 19103
(215) 735-8700

Dated: May 20, 2013

Special Counsel for Plaintiff
Alfred T. Giuliano, Chapter 7 Trustee

JS 44 (Rev. 12/12)

**CIVIL COVER SHEET**

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| ALFRED T. GIULIANO, as Chapter 7 Trustee for the jointly administered Chapter 7 estates of Debtors DSI Renal Holdings LLC, DSI Hospitals, Inc., and DSI Facility Development, LLC | SEE ATTACHED |

**(b)** County of Residence of First Listed Plaintiff _____

*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _____

*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Steven M. Coren, Esquire       2001 Market Street
Kaufman, Coren & Ress, P.C.    Suite 3900
(215) 735-8700                 Philadelphia, PA 19103

Attorneys *(If Known)*

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question *(U.S. Government Not a Party)*
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff and One Box for Defendant)* *(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane / ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability / Product Liability | | | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & / ☐ 367 Health Care/ | | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | Slander / Pharmaceutical Personal Injury | | ☐ 820 Copyrights | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' / Product Liability | | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student Loans | Liability / ☐ 368 Asbestos Personal Injury Product | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| (Excludes Veterans) | ☐ 340 Marine / Liability | | | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 345 Marine Product Liability / **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 350 Motor Vehicle / ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 190 Other Contract | ☐ 355 Motor Vehicle Product Liability / ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 862 Black Lung (923) | ☒ 890 Other Statutory Actions |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury / ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 196 Franchise | ☐ 362 Personal Injury - / ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| | Medical Malpractice | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** / **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights / **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 220 Foreclosure | ☐ 441 Voting / ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment / ☐ 510 Motions to Vacate Sentence | | | |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations / ☐ 530 General | | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment / ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other / **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education / ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | / ☐ 550 Civil Rights | | | |
| | / ☐ 555 Prison Condition | | | |
| | / ☐ 560 Civil Detainee - Conditions of Confinement | | | |

**V. ORIGIN** *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation

**VI. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
11 USC§§544, 548

Brief description of cause:
Fraudulent Transfer

**VII. REQUESTED IN COMPLAINT:**

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $
425,000,000.00

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

**VIII. RELATED CASE(S) IF ANY**

*(See instructions):*

JUDGE _____   DOCKET NUMBER _____

DATE
05/20/2013

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

**DEFENDANTS**

1. CDSI I HOLDING COMPANY, INC.
2. CDSI II HOLDING COMPANY, INC.
3. MICHAEL SCHNABEL
4. BRUCE POLLACK
5. LEIF MURPHY
6. ROBERT BERGMANN
7. KEN KENCEL
8. JAY YALOWITZ
9. CENTRE PARTNERS MANAGEMENT LLC
10. CENTRE BREGAL PARTNERS, L.P.
11. CENTRE CAPITAL INVESTORS IV, L.P.
12. CENTRE CAPITAL NON-QUALIFIED INVESTORS IV, L.P.
13. CENTRE PARTNERS COINVESTMENT IV, L.P.
14. CENTRE PARTNERS IV L.P.
15. CENTRE PARTNERS IV LLC
16. CENTRE PARTNERS COINVESTMENT V, L.P.
17. CENTRE CAPITAL INVESTORS V, L.P.,
18. CENTRE CAPITAL NON-QUALIFIED INVESTORS V, L.P.
19. CENTRE BREGAL PARTNERS II, L.P.
20. CENTRE PARTNERS V L.P.
21. CENTRE PARTNERS V LLC
22. THE NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY
23. THE NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY FOR ITS GROUP ANNUITY SEPARATE ACCOUNT
24. APOLLO INVESTMENT CORPORATION
25. ARES CAPITAL CORPORATION

UNITED STATES DISTRICT COURT

**13 2776**

FOR THE EASTERN DISTRICT OF PENNSYLVANIA — DESIGNATION FORM to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.

Address of Plaintiff: c/o Kaufman, Coren & Ress, P.C., 2001 Market Street, Suite 3900, Philadelphia, PA 19103

Address of Defendant: SEE ATTACHED

Place of Accident, Incident or Transaction: This case involves, inter alia, fraudulent transfers effectuated in connection with the restructuring of a group of related Delaware dialysis corporations and an oncoplastic hospital located in Bucks County, Pennsylvania. The defrauded creditors are located throughout the country, with a large number of them in Bucks County, Pennsylvania.

*(Use Reverse Side For Additional Space)*

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?

(Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1(a))   Yes☐   No✔

Does this case involve multidistrict litigation possibilities?   Yes☐   No✔

*RELATED CASE, IF ANY:*

Case Number: _____ Judge _____ Date Terminated: _____

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?   Yes☐   No✔

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?   Yes☐   No✔☐

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court?   Yes☐   No✔

4. Is this a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?   Yes☐   No✔

CIVIL: (Place ✔ in ONE CATEGORY ONLY)

A. *Federal Question Cases:*
1. ☐ Indemnity Contract, Marine Contract, and All Other Contracts
2. ☐ FELA
3. ☐ Jones Act-Personal Injury
4. ☐ Antitrust
5. ☐ Patent
6. ☐ Labor-Management Relations
7. ☐ Civil Rights
8. ☐ Habeas Corpus
9. ☐ Securities Act(s) Cases
10. ☐ Social Security Review Cases
11. ✔ All other Federal Question Cases
    (Please specify) 11 USC§§ 544, 548

B. *Diversity Jurisdiction Cases:*
1. ☐ Insurance Contract and Other Contracts
2. ☐ Airplane Personal Injury
3. ☐ Assault, Defamation
4. ☐ Marine Personal Injury
5. ☐ Motor Vehicle Personal Injury
6. ☐ Other Personal Injury (Please specify)
7. ☐ Products Liability
8. ☐ Products Liability — Asbestos
9. ☐ All other Diversity Cases
   (Please specify) _____

**ARBITRATION CERTIFICATION**
*(Check Appropriate Category)*

**MAY 20 2013**

I, Steven M. Coren, counsel of record do hereby certify:

✔ Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;

✔ Relief other than monetary damages is sought.

DATE: May 20, 2013 _____ Attorney-at-Law   32140   Attorney I.D.#

**NOTE:** A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.\

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: May 20, 2013 _____ Attorney-at-Law   32140   Attorney I.D.#

CIV. 609 (5/2012)

## **DEFENDANTS**

CDSI I HOLDING COMPANY, INC.
2711 Centerville Road, Suite 400
Wilmington, Delaware 19808

CDSI II HOLDING COMPANY, INC.
2711 Centerville Road, Suite 400
Wilmington, Delaware 19808

MICHAEL SCHNABEL
825 Third Avenue, 40th Floor
New York, NY 10022

BRUCE POLLACK
 825 Third Avenue, 40th Floor
New York, NY 10022

LEIF MURPHY
4909 Maymanor Circle
Nashville, TN 37205

ROBERT BERGMANN
13600 Romany Drive
Pacific Palisades, CA 90272

KEN KENCEL
190 North Street
Greenwich, CT 06830

JAY YALOWITZ
1700 Stokes Lane
Nashville, TN 37215

CENTRE PARTNERS MANAGEMENT LLC
825 Third Avenue, 40th Floor
New York, NY 10022

CENTRE BREGAL PARTNERS, L.P.
825 Third Avenue, 40th Floor
New York, NY 10022

CENTRE CAPITAL INVESTORS IV, L.P.
825 Third Avenue, 40th Floor
New York, NY 10022

CENTRE CAPITAL NON-QUALIFIED INVESTORS IV, L.P.
825 Third Avenue, 40th Floor
New York, NY 10022

CENTRE PARTNERS COINVESTMENT IV, L.P.
825 Third Avenue, 40th Floor
New York, NY 10022

CENTRE PARTNERS IV L.P.
825 Third Avenue, 40th Floor
New York, NY 10022

CENTRE PARTNERS IV LLC
825 Third Avenue, 40th Floor
New York, NY 10022

CENTRE PARTNERS COINVESTMENT V, L.P.
825 Third Avenue, 40th Floor
New York, NY 10022

CENTRE CAPITAL INVESTORS V, L.P.
825 Third Avenue, 40th Floor
New York, NY 10022

CENTRE CAPITAL NON-QUALIFIED INVESTORS V, L.P.
825 Third Avenue, 40th Floor
New York, NY 10022

CENTRE BREGAL PARTNERS II, L.P.
825 Third Avenue, 40th Floor
New York, NY 10022

CENTRE PARTNERS V L.P.
825 Third Avenue, 40th Floor
New York, NY 10022

CENTRE  PARTNERS V LLC
825 Third Avenue, 40th Floor
New York, NY 10022

THE NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY
 720 East Wisconsin Avenue
Milwaukee, Wisconsin 53202

THE NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY FOR ITS GROUP
  ANNUITY SEPARATE ACCOUNT
720 East Wisconsin Avenue
Milwaukee, Wisconsin 53202

APOLLO INVESTMENT CORPORATION
9 West 57th Street
New York, NY 10019

ARES CAPITAL CORPORATION
245 Park Avenue, 44th Floor
New York, NY 10167

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

## CASE MANAGEMENT TRACK DESIGNATION FORM

| | | |
|---|---|---|
| ALFRED T. GIULIANO, Ch. 7 Trustee, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| CDSI I HOLDING COMPANY, INC., et al. | : | NO. 13 2776 |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

## SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.　　　　　( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
　　and Human Services denying plaintiff Social Security Benefits.　　　　　( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.　( )

(d) Asbestos – Cases involving claims for personal injury or property damage from
　　exposure to asbestos.　　　　　( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
　　commonly referred to as complex and that need special or intense management by
　　the court. (See reverse side of this form for a detailed explanation of special
　　management cases.)　　　　　( )

(f) Standard Management – Cases that do not fall into any one of the other tracks.　　(X)

| | | |
|---|---|---|
| _5/20/2013_ | _Steven M. Coren, Esquire_ | _Alfred T. Giuliano, Ch. 7 Trustee_ |
| **Date** | **Attorney-at-law** | **Attorney for** |
| | | |
| _(215) 735-8700_ | _(215) 735-5170_ | _Scoren@kcr-law.com_ |
| **Telephone** | **FAX Number** | **E-Mail Address** |

**(Civ. 660) 10/02**



MAY 20 2013