## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | CHAPTER 7 |
| | : | |
| DSI RENAL HOLDINGS, LLC, *et al.*, | : | Case No. 11-11722 (KJC) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |
| ALFRED T. GIULIANO, | : | Adv. Proc. No. 14-50356 (KJC) |
| as Chapter 7 Trustee, | : | (Adv. D.I. 14, 15, 16, 17) |
| Plaintiff, | : | |
| v. | : | |
| | : | |
| MICHAEL SCHNABEL, *et al.*, | : | |
| Defendants. | : | |

## OPINION

### BY: KEVIN J. CAREY, UNITED STATES BANKRUPTCY JUDGE

### BACKGROUND

On June 3, 2011 (the "Petition Date"), Debtors DSI Renal Holdings LLC ("DSI Renal Holdings"), DSI Hospitals, Inc. ("DSI Hospitals"), and DSI Facility Development, LLC ("DSI Facility"), filed voluntary petitions for relief under Chapter 7 of the United States Bankruptcy Code[1] in the United States Bankruptcy Court for the District of Delaware.[2] On May 20, 2013, Alfred T. Giuliano, as Chapter 7 Trustee for the jointly administered Chapter 7 estates of the Debtors (the "Trustee"), filed an adversary complaint (the "Complaint") in the United States District Court for the Eastern District of Pennsylvania (the "Pennsylvania District Court") against

---

[1] 11 U.S.C. § 101 *et seq.*

[2] The bankruptcy cases of DSI Renal Holdings, DSI Hospitals and DSI Facility are jointly administered under the caption *In re DSI Renal Holdings LLC, et al.*, Ch. 7 Case No. 11-11722 (KJC) (Bankr. D. Del.) (the "Delaware Bankruptcy Case"). *See* Order dated July 27, 2011. D.I. 25. DSI Renal Holdings, DSI Hospitals and DSI Facility are referred to collectively herein as the "Debtors."

Apollo Investment Corporation ("Apollo"), Ares Capital Corporation ("Ares"), the Centre

Defendants,[3] the Director and Officer Defendants (the "D&O Defendants"),[4] and The

Northwestern Mutual Life Insurance Company, for itself and for its Group Annuity Separate

Account (in either capacity, the "NML Defendants")[5] seeking, among other things, to recover in

excess of $425 million in alleged fraudulent transfers.[6] On August 5, 2013, the Defendants filed

motions to dismiss the Complaint for failure to state a claim and, with regard to Count 8, lack of

subject matter jurisdiction (the "Motions to Dismiss"),[7] and motions to dismiss for improper venue

or, in the alternative, to transfer the action to the United States District Court for the District of

Delaware (the "Delaware District Court") for referral to this Court (the "Improper Venue

Motions").

On March 17, 2014, the Pennsylvania District Court entered an order transferring the case

to the Delaware District Court.[8] The Delaware District Court referred the case to this Court,[9]

commencing this adversary proceeding (Adv. Proc. No. 14-50356). Subsequently, I heard oral

---

[3] The Centre Defendants are, collectively, Centre Partners Management LLC, Centre Bregal Partners, L.P., Centre Bregal Partners II, L.P., Centre Capital Investors IV, L.P., Centre Capital Investors V, L.P., Centre Capital Non-Qualified Investors IV, L.P., Centre Capital Non-Qualified Investors V, L.P., Centre Partners Coinvestment IV, L.P., Centre Partners Coinvestment V, L.P., Centre Partners IV L.P., Centre Partners IV, LLC, Centre Partners V, L.P., and Centre Partners V, LLC.

[4] The D&O Defendants are: Michael Schnabel, Leif Murphy, Bruce Pollack, Robert Bergmann, and Jay Yalowitz. All claims against director Ken Kencel were dismissed without prejudice on November 1, 2013, pursuant to Fed. R. Civ. P. 41(a)(1)(A)(i), made applicable hereto by Fed. R. Bankr. P. 7041. Adv. D.I. 42.

[5] Ares, Apollo, the Centre Defendants, the D&O Defendants, and the NML Defendants are referred to collectively herein as the "Defendants." All claims against CDSI I Holding Company, Inc. (CDSI I), and CDSI II Holding Company, Inc. (CDSI II), were dismissed without prejudice on August 2, 2013, pursuant to Fed. R. Civ. P. 41(a)(1)(A)(i), made applicable hereto pursuant to Fed. R. Bankr. P. 7041. Adv. D.I. 11.

[6] The Complaint was docketed in the United States District Court for the Eastern District of Pennsylvania, C.A. No. 13-CV02776-CMR.

[7] Items on the docket for this Adversary Proceeding No. 14-50356 are referred to as "Adv. D.I. ___." The Motions to Dismiss are Adv. D.I.s 14, 15, 16 and 17.

[8] Adv. D.I. 24.

[9] Adv. D.I. 29.

argument on the Motions to Dismiss. For the reasons set forth herein, the Motions to Dismiss will

be denied in part, granted in part, and deferred in part.

The following chart presents the counts from the Complaint, and states whether the

Motions to Dismiss are denied, granted or deferred as to each Count, for reasons discussed in this

Opinion.

| Count Number | Claim | Motion to Dismiss denied or granted | Defendants |
|---|---|---|---|
| 1 | Avoidance of Transfers Pursuant to 11 U.S.C. § 548(a)(1)(A). | Denied | All Defendants |
| 2 | Avoidance of Transfers Pursuant to 11 U.S.C. § 548(a)(1)(B). | Deferred | All Defendants |
| 3 | Avoidance of Transfers Pursuant to 6 Del. C. §§ 1304 & 1305, and 11 U.S.C. § 544. | Deferred | All Defendants |
| 4 | Recovery of Transfers under 11 U.S.C. § 550 | Denied in part; Deferred in part | All Defendants |
| 5 | Breach of Fiduciary Duty | Denied | D&O Defendants and Centre Defendants |
| 6 | Aiding and Abetting Breach of Fiduciary Duty | Denied | All Defendants |
| 7 | Corporate Waste | Granted in part, Denied in part | D&O Defendants and Centre Defendants |
| 8 | Declaratory Judgment | Granted | |
| 9 | Equitable Subordination under 11 U.S.C. § 510(c) | Withdrawn[10] | All Defendants |

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and § 157(a).

Counts 1 through 4 are core proceedings pursuant to 28 U.S.C. §157(b)(1) and (b)(2)(H). The

---

[10] The Trustee withdrew Count 9 without prejudice during oral argument. Adv. D.I. 53, at 7-8.

remaining counts are non-core. The Trustee demands a jury trial for all claims, and does not consent to the entry of final judgment or adjudication by this Court. Compl. ¶ 4.

The Bankruptcy Court may enter an order on a motion to dismiss even if the matter is non-core or it has no authority to enter a final order on the merits.[11] To the extent parties do not agree that this Court may enter a final order for non-core related proceedings, or if any court determines that a final order or judgment in this matter by this Court is not consistent with Article III of the United States Constitution, then this Opinion and Order are submitted as proposed findings of fact and conclusions of law in accordance with the District Court's Amended Standing Order of Reference dated February 29, 2012.[12]

## FACTUAL ALLEGATIONS

This case is somewhat unusual in that, before filing his Complaint, the Trustee had the benefit of extensive discovery through (a) numerous documents in the Trustee's possession, including company board minutes, internal and external company emails, insider emails and internal notes and emails of the Debtors' prior counsel; and (b) sworn deposition testimony taken in connection with the Trustee's investigation and examinations under Fed. R. Bankr. P. 2004, including those of (i) the Debtors' former outside counsel, (ii) Defendant Murphy, (iii) Defendant Yalowitz, and (iv) Defendant Schnabel. Compl. ¶ 89. A summary of the factual allegations in the Complaint follows.

---

[11] *See Burtch v. Owlstone, Inc. (In re Advance Nanotech, Inc.)*, Bky. No. 11–10776 (MFW), Adv. No. 13-51215, 2014 WL 1320145, at *2 (Bankr. D. Del. Apr. 2, 2014) (citing *O'Toole v. McTaggart (In re Trinsum Grp., Inc.)*, 467 B.R. 734, 739 (Bankr. S.D.N.Y. 2012)) ("After *Stern v. Marshall*, the ability of bankruptcy judges to enter interlocutory orders in proceedings . . . has been reaffirmed . . . ."); *see also Boyd v. King Par, LLC*, Case No. 1:11–CV–1106, 2011 WL 5509873, at *2 (W.D. Mich. Nov. 10, 2011) ("[U]ncertainty regarding the bankruptcy court's ability to enter a final judgment . . . does not deprive the bankruptcy court of the power to entertain all pretrial proceedings, including summary judgment motions.").

[12] *See, e.g., Zazzali v. 1031 Exchange Grp. (In re DBSI, Inc.)*, 467 B.R. 767, 775-76 (Bankr. D. Del. 2012).

The Debtors (DSI Renal Holdings, DSI Hospitals, and DSI Facility), are the empty shells of a healthcare conglomerate that once comprised more than twenty-five companies. Compl. ¶ 35. On the Petition Date, DSI Renal Holdings and DSI Facility were Delaware limited liability companies, and DSI Hospitals was a Delaware corporation. Compl. ¶ 7. Prior to the Petition Date, the Debtors' ultimate parent, DSI Holding Company, Inc. ("DSI Holding"), a Delaware corporation, was merged into DSI Renal Holdings during a restructuring in 2010, with DSI Renal Holdings as the surviving company. Compl. ¶¶ 7, 83-85.

The crux of the Trustee's Complaint is that the Defendants orchestrated a restructuring of the DSI entities through a complex series of agreements, transfers and transactions that, ultimately, stripped DSI Renal Holdings (formerly DSI Holding) of its valuable assets by diluting its 100% ownership of the operating subsidiaries to less than one-thousandth of a percent of an interest (*i.e.,* 1 share of a total of 138,154.275 shares) in the post-restructuring entity. Compl. ¶¶ 71- 85. The Trustee alleges that, as a result of the restructuring, the Debtors were left as insolvent shells, with liabilities in excess of $40 million and assets as little as $300,000. Compl. ¶ 86a. When the Renal Business (defined *infra.*) was sold in February 2011 for more than $700 million to DaVita, Inc. (the "DaVita Merger Transaction") (Compl. ¶¶ 1, 100), the Debtors remained insolvent, while the Defendants shared sale proceeds of more than $425 million. Compl. ¶ 86b.

<u>The Pre-Petition Companies</u>

DSI Holding, the prepetition parent company, through its 100% ownership of DSI Renal Holdings, DSI Renal, Inc. ("DSI Renal") and its operating subsidiaries, was the fifth-largest provider of outpatient dialysis clinics in the United States, owning and operating 106 clinics and providing services to twenty-six acute care facilities (the "Renal Business"). Compl. ¶¶ 36, 74(b).

As of October 31, 2009, the Debtors' clinics treated approximately 7,800 patients in twenty-three states and generated annual revenues of approximately $350 million. *Id.*

The Trustee alleges that the Debtors and their subsidiaries operated as a single entity, with millions of dollars routinely transferred among the companies without regard to which company generated the cash or which company incurred the expense being paid. Compl. ¶ 44.

For the year ending December 31, 2008, the Debtors - - who had filed consolidated tax returns - - suffered a write-down of more than $100 million in the value of accounts receivable. Compl. ¶ 37. Around October 2008, Defendant Lief Murphy was hired to serve as CEO and implement a turnaround plan. Compl. ¶ 38.

Debtor DSI Hospitals (a subsidiary of DSI Holding) owned a specialty breast cancer treatment hospital in Bensalem, Pennsylvania—Bucks County Oncoplastic Institute, LLC (the "Bucks County Hospital" or "Bucks County"). Compl. ¶ 39. Because the Bucks County Hospital was never profitable and incurred tens of millions of dollars of losses, Defendant Murphy recommended closure of the Bucks County Hospital. Compl. ¶¶ 40-41.

After unsuccessful negotiations with secured creditor MPT of Bucks County, L.P. ("MPT"), DSI Hospitals closed the Bucks County Hospital. Compl. ¶¶ 45-46. According to an email authored by DSI Holding's former CEO, DSI Holding guaranteed between $7-9 million of claims owing to creditors of the Bucks County Hospital (MPT and Siemens). Compl. ¶ 90(c).

<u>The Tennessee Bankruptcy Case</u>

The Trustee alleges that, to avoid DSI Holdings' liability for the debts of the Bucks County Hospital, the Debtors' management/directors caused the Bucks County Hospital to commence a Chapter 7 bankruptcy case in Tennessee on March 30, 2009 (the "Tennessee

Bankruptcy Case").[13] Compl. ¶ 47. The Bucks County Hospital's schedules showed debts in excess of $36 million owed to more than 200 creditors. Compl. ¶ 48.

In numerous internal documents, directors and officers of DSI Holding conceded the company's potential liability to numerous creditors of the Bucks County Hospital and were concerned that the creditors would take action against the Debtors on the theory that DSI Holdings and Bucks County "were the same entity." Yet, in most instances, DSI Holdings' status as "co-debtor" for the Bucks County Hospital was omitted from the schedules, and the Tennessee Bankruptcy Case closed without that status ever having been revealed. Compl. ¶¶ 49-53, 90(c). The Trustee alleges that company insiders did not disclose DSI Holding's codebtor status to diminish the likelihood that the Bucks County Hospital's creditors would commence litigation or take other action, such as filing an involuntary bankruptcy proceeding, against DSI Holding, which would have "torpedoed" the Defendants' scheme to strip out the Renal Business. Compl. ¶¶ 51, 90(f).

To substantiate these allegations, the Trustee quotes two emails about dragging out actions that could have potentially brought to light the connection between the Debtors and the Bucks County Hospital. Compl. ¶¶ 52-53. A September 25, 2009 email from Defendant Yalotitz (the company's former general counsel) to Defendant Murphy (the company's former CEO) states:

> FYI. The Trustee [in the Tennessee Bankruptcy Case] has filed suit against DSI Holding Company seeking recovery of $90,000 in management fees that we received . . . In light of what may likely occur with DSI Holding Company I am going to slow walk this and try to drag it out as long as possible.

---

[13] The Tennessee Bankruptcy Case was captioned *In re Bucks County Oncoplastic Institute, LLC*, Ch. 7, Case No. 09-03570-MH3-7 (Bankr. M.D. Tenn.).

Compl. ¶ 52. And a November 23, 2009 email from the Bucks County Hospital's bankruptcy counsel to Defendant Yalowitz states:

> [The Tennessee Bankruptcy Court] asked that we notify all Bucks County creditors of our joint representation [of DSI Holding and Bucks County] and give them an opportunity to object. I'm thinking maybe we should wait a few weeks before sending that notice in order to see what happens at the DSI level, because I don't want such a notice to give any more creditors the idea that they can/should sue DSI for Bucks County debt on the theory that they are the same entity.

Compl. ¶ 53. The trustee in the Tennessee Bankruptcy Case (the "Tennessee Trustee") eventually distributed about $215,000[14] to about forty creditors on account of scheduled claims initially exceeding $36 million. Compl. ¶ 54.

On or about January 11, 2013 (as a result of the Trustee's allegations in the Complaint filed in this adversary proceeding), the United States Trustee for the Middle District of Tennessee filed a motion to reopen the Tennessee Bankruptcy Case. Compl. ¶ 55. On February 6, 2013, the Tennessee Bankruptcy Court granted the motion and reopened the Tennessee Bankruptcy Case. Compl. ¶ 56.[15]

---

[14] The final figure distributed to claimants was $214,535.37 according to the Tennessee Trustee's Final Account and Distribution Report 1, *In re Bucks County Oncoplastic Institute, LLC*, No. 09-03570-MH3-7 (M.D. Tenn. June 6, 2012), ECF No. 181.

[15] Since the Complaint was filed on May 20, 2013, several proofs of claim ("POC") related to the Bucks County Hospital debt have been filed in the reopened Tennessee Bankruptcy Case and the Delaware Bankruptcy Case. On May 31, 2013, MPT filed a POC in the Delaware Bankruptcy Case for $10.4 million with a detailed attachment in support. (Claims Register, *In re DSI Renal Holdings LLC, et al.*, No. 11-11722 (KJC) (Bankr. D. Del.), Claim No. 15-1). On July 10, 2013, MPT amended a POC filed in the original Tennessee Bankruptcy Case (based on an alleged breach of contract related to a lease and promissory notes), by amending the claim amount from "Unknown" to $75.5 million. (Claims Register, *In re Bucks County*, No. 09-03570-MH3-7 (M.D. Tenn.), Claim Nos. 53-1 & 53-2). On August 22, 2013, the Tennessee Trustee filed a $108 million POC in the Delaware Bankruptcy Case, including MPT's $75.5 million claim. (Claims Register, *In re DSI Renal Holdings LLC*, et al., No. 11-11722 (KJC) (Bankr. D. Del. Aug. 22, 2013), Claim No. 16-1). On October 11, 2013, the Tennessee Trustee amended the POC to $151,822,439, itemized as $103 million in total claims filed in the Tennessee Bankruptcy Case, minus the $235,614 distributed, plus $45.5 million in interest at 10% from April 2, 2009-August 31, 2013, $3.5 million Trustee commission, and $40,000 for various fees and expenses. (*Id.*, Claim No. 16-2. On July 8, 2014, Siemens amended a previously stated claim to the final amount of $3,122,039. (*Id.*, Claim No. 10-2).

<u>The Stabilization of the Renal Business</u>

Promptly after he was hired in October 2008, Defendant Murphy identified and implemented revenue enhancement opportunities (in the form of increased insurance reimbursement from third-party payers), and expense reduction opportunities, effecting a dramatic improvement of the Debtors' business and finances. Compl. ¶¶ 38, 57. By June 2009, the Debtors' turnaround plan was well on its way to success, with the company having experienced two consecutive quarters of improved financial operation and better than projected revenues and earnings. Compl. ¶ 58. Both management and the D&O Defendants expected that operational and financial performance would continue to improve through the end of 2009 and beyond, with 2009 earnings then projected between $56 - 61 million. Compl. ¶59.

> The Trustee Alleges the Insider Defendants Conducted a Half-hearted Sale Process as Cover for Their Unlawful Scheme to Strip Out Substantially all of <u>the Assets of DSI Renal Holdings LLC for the Benefit of the Defendants</u>

The Trustee alleges that, as part of a ruse to appease its lenders and establish a suppressed "restructure valuation" to the detriment of certain shareholders and "all of the Debtors' non-insider creditors," the Debtors engaged Goldman Sachs to solicit outside interest in acquiring the companies.[16] Compl. ¶ 60. Goldman Sachs did not use updated earnings projections as part of the attempted sale process, resulting in low-ball offers that did not represent the companies' fair value. Compl. ¶¶ 64, 66. The Complaint references internal documents showing, *inter alia*, Defendant Murphy's elation at receiving a "pathetic" offer from DaVita, Inc. (the post-restructuring purchaser) (Compl. ¶ 63), and, around the same time, the NML Defendants' awareness that a "strong turnaround is underway," (Compl. ¶ 65). The Trustee asserts that the documents support the theory that the sale process was a prematurely terminated sham meant

---

[16] The Trustee has not asserted any claims against Goldman Sachs in the Complaint.

to justify the restructuring based upon an artificially depressed valuation. Compl. ¶¶ 62-70. This gave the Defendants the opportunity to pilfer the Debtors' ownership in the Renal Business, the only remaining asset in the entire corporate structure and effectively its "crown jewel," before its true worth was known to outsiders. Compl. ¶¶ 65-67, 69-70.

> The Trustee Alleges that Insider Defendants Caused the Fraudulent Transfer of DSI Renal through the DSI Restructuring and Subsequent Sale to DaVita - - all to the Substantial Detriment of "the Debtors' Non-insider Creditors"

On September 14, 2009, at a joint meeting of the board of directors of DSI Holding and DSI Renal, the Director Defendants voted to terminate the Goldman Sachs sale process, to provide no additional information to bidders (rebuffing an expressed willingness by eventual purchaser DaVita to increase its offer), and, instead, to pursue a restructuring of the company.[17] Compl. ¶¶ 68, 71. On January 6, 2010, the Director Defendants approved a global restructuring of the Debtors and their affiliates, including the operating subsidiary DSI Renal (the "DSI Restructuring"), which closed on January 11, 2010. Compl. ¶¶ 72-73.

The Trustee alleges that the DSI Restructuring plan was developed by the Centre Defendants who, at that time, owned 46% of the stock of DSI Holding and controlled a majority of the boards of the Debtors and their subsidiaries. Compl. ¶¶ 74, 90(d).

The alleged scheme involved: (a) the formation of two new holding companies - - *i.e.*, former defendants CDSI I and CDSI II - - approximately 90% of whose stock was issued to the Debtor's largest shareholders (*i.e.*, 49.1% to the Centre Defendants, 19.8% to the NML Defendants, 14.3% to Ares, and 6.7% to Apollo), while 10% of the stock was issued to the Debtor's other shareholders; and, (b) the transfers by DSI Holding of: (i) the Debtor's 100% ownership interest

---

[17] The Trustee also alleges that the Centre Defendants, and NML Defendants pushed to end the sale process prematurely to begin the DSI Restructuring. Compl. ¶¶ 65, 69.

in DSI Renal; (ii) $250 million of net operating loss carryforwards; (iii) the Debtor's management contracts and upper-management team; and (iv) fixed assets (*e.g.*, desks, computers, furniture, etc.) and certain receivables. Compl. ¶¶ 74, 83-85. In return for these transfers, DSI Renal Holdings/DSI Holding received one share out of 138,154,275 total shares of stock in CDSI I, an "insignificant amount of cash, and relief from certain liabilities to insiders." Compl. ¶¶ 74(b), 80. As part of the seven step DSI Restructuring process (detailed in paragraph 84 of the Complaint), DSI Holding was merged with and into the surviving company - - Debtor DSI Renal Holdings. Compl. ¶ 84.

In January 2010, the Defendants placed a restructuring value on the company of $477.7 million. Compl. ¶ 75. To enable insiders to purchase the Renal Business at an artificially low price, the Trustee alleges that the restructuring value was not based upon fair market value, but upon the debt associated with the continued operation of the Renal Business and restructuring costs. Compl. ¶ 75-77.

To support his allegations of the suppressed restructuring value, the Trustee also asserts the following:

- A September 30, 2009, pre-restructuring internal valuation by the Centre Defendants valued the restructured company at approximately $562 million; this valuation was itself $30 million higher than a valuation three months earlier and an amount sufficient to pay the Debtors' creditors in full. Compl. ¶ 78.

- When DSI Holding's former CEO (replaced by Defendant Murphy) and one of its consulting surgeons threatened to derail the restructuring by expressing the view that the company was worth $632 million, the D&O Defendants caused the former CEO and surgeon to receive consideration worth approximately $2 million in exchange for "cooperating" with the restructuring. Compl. ¶ 79.

- An excerpt of an email sent by an officer of the NML Defendants dated July 27, 2010, within six months of the restructuring, describes an offer of $650 million for the company as "clearly too low." Compl. ¶ 98. The email also states that Centre (referred to as one entity) "is thinking around 900mm . . . ." *Id.*

- On February 4, 2011, the business was sold to DaVita for $700 million, of which Defendants received $425 million. Compl. ¶¶ 86(b), 100.[18]
  Internal Documents and Sworn Testimony

The Trustee provided support for his allegations through many documents and via sworn testimony obtained in discovery. Among the documents:

- A September 2, 2009 email from a senior attorney on Debtors' restructuring team which notes that, "we understand that DSI Holding has guaranteed obligations of Bucks County [Hospital] . . . for a total of approx. $8M . . . . To get around these guarantee obligations [of the Bucks County Hospital], Centre and a subset of existing DSI investors are contemplating putting funds into a new entity . . . ." Compl. ¶ 90(a).

- A September 9, 2009 email in which Defendant Murphy states that one of the primary goals of the restructuring is to "[p]rotect the new capital from guarantor claims against Holdings." Compl. ¶ 90(b).

- A September 20, 2009 memo from Defendant Murphy stating, "Prior to October 2008, all of the Buck's [County Hospital] Pos were issued under Holdings name, making it possible for a number of the Buck's creditors to attempt to look to Holdings for satisfaction of the invoice amounts." Compl. ¶ 90(c).

- A September 29, 2009 email in which the Debtors' lead restructuring counsel states: "Centre wants to liquidate just the holding company [DSI Renal Holdings/DSI Holding] and do their new equity investment at a level below that, wiping out the claims of the creditors at holdings [the Debtor] and thru the investment wiping out the equity interest of holdings [the Debtor] in [DSI Renal]." Compl. ¶ 90(d).

- An October 2, 2009 email between Debtors' restructuring counsels states concerns about the risks arising if a bankruptcy were commenced before the restructuring was complete: "To be clear, any equity that resides at DSI Renal and below would become an asset in any Holdings' bankruptcy. Putting on my chapter 7 trustee cap, I would probably (i) order a valuation of the full enterprise, (ii) consider an auction to sell the equity interests, and (iii) investigate any and all claims/causes of action against Holdings' [directors and officers] like bad faith filing, breach of fiduciary duty . . . ." Compl. ¶ 90(f).

---

[18] The Trustee notes that he asserts no claims against DaVita and does not seek to avoid DaVita's purchase of the Debtors' operating subsidiaries (including DSI Renal). Compl. ¶ 86(b) n.4.

- An October 16, 2009 email exchange between Debtor's former outside auditor, KPMG, and its former treasurer states in part:

  > Former Auditor: One sticking point: early in our discussions, someone mentioned that there was some debt at the DSI Holding level (I want to say guarantees of some loans) and a goal was to avoid using new equity to pay off that debt. Has there been any further discussions about how that may be accomplished?

  > Former Treasurer: Right now it appears that we will be forming a new acquisition sub . . . to buy DSI Renal, Inc. We will then shut down the holding company since there are no assets there and only such guarantees.

  Compl. ¶ 90(h).

- A June 25, 2010 email exchange between Debtor's former general counsel [it is unclear from the complaint whether this is Defendant Yalowitz] and former CEO states a concern that creditor MPT might challenge the restructuring over their guaranty.

  > Former general counsel: I assume what he means is that they [creditor MPT] might challenge the restructuring.

  > Former CEO: Yep. Over their guaranty. Seems like a lot to establish for a small amount of money [$4 million].

  > Former general counsel: Well of course that's the whole reason we did it— spent millions of dollars to restructure just to avoid the guaranty.

  Compl. ¶ 90(r).

- A December 2, 2009 email from Debtor's lead restructuring counsel states: "Think a fairness opinion would help here? I assumed you would never get [Goldman Sachs] to say the deal was 'fair' to the stockholder of dsi renal [Debtor DSI Renal Holdings] as they are effectively getting wiped out—pretty tough opinion to give." Compl. ¶ 90(j).

- Minutes of the December 23, 2009 Joint Meeting of the Board of Directors report Director Defendant and CEO Murphy informing the board of the risk that "creditors (such as MPT, Siemens, Bucks County vendors that had been issued DSIHC purchase orders) could seek to challenge the transaction on the basis of a preference, fraudulent conveyance, breach of fiduciary duty or other theory . . . ." Compl. ¶ 90(n).

- Deposition testimony from Defendant Schnabel that:

    o "the renal business is where the operations were, where the value was"

    o "There was no reason to invest in the old holding company anymore. We wanted to invest in the renal business only, not in any of the other operations."

    o "The only operating business at the time was the renal business . . . ."

    o Q:       Well, was there some reason you didn't want to put money in the holding company? Was there a reason you can think of?

    A:       Again, we wanted to invest in and save the renal business and we only wanted the ongoing—we only wanted the assets and liabilities associated with the ongoing operations of the renal business.

    o Q:       Okay. So, the intent was to isolate the, what you considered to be the assets and liabilities with running Renal, and they would stay with the restructured company and everything else would be left behind; is that correct?

    A:       Correct

    Q:       And everybody, to your knowledge, all the people involved knew that motivation; is that correct? [objections omitted]

    A:       To my knowledge, yes.

    o "There was no desire on the part of the new investors or the creditors who were transferring to equity to take on any liabilities that were not associated with the ongoing operations of the Renal business."

Compl. ¶ 91(a).

- The sworn testimony of Defendant Murphy:

    Q:       And then the final goal was to protect the new capital from the guarantor claims against Holdings, correct?

    A:       That's correct.

    Q:       And the claims . . . included 7 to 9 million in guarantees to MPT and/or Siemens?

A:    That's right.

Compl. ¶ 91(b).

- The sworn testimony of one of the Debtor's [unnamed] outside counsel:

   o  Q:    Well, the goal, was it not, was to put money in that would not be subject to the claims of the unsecured creditors at that level, correct?

   A:    I'm not sure what the goal was, but looking at this email, my recollection is that there was a concern that if we were to put money in at DSI Holding, then the existing trade creditors would have access to it.

   Q:    And there was an effort to avoid that from happening, correct?

   A:    I think there were several considerations in structuring the transaction the way we did. That may have been one among several.

   Q:    [I]t's not a question of may have been, you knew that was one of the considerations, correct?

   A:    From what I can remember right now, probably.

   Q:    Is that a yes?

   A:    That's as far as I can remember right now, yeah.

   o  Q:    What do you recall about the liabilities that were not intended to be paid as part of the restructuring or by the restructured company? Which liabilities were being left behind?

   A:    The liabilities to the unsecured creditors.

Compl. ¶ 91(c)(2)-(3).

With specific regard to Defendant Yalowitz on Counts 5 and 7:

- A September 25, 2009 email states: "FYI. The Trustee [in the Tennessee Bankruptcy Case] has filed suit against DSI Holding seeking recovery of $90,000 in management fees that we received. . . . In light of what may likely occur with DSI Holding Company I am going to slow walk this and try to drag it out as long as possible." Compl. ¶ 52.

- An October 1, 2009 email between Debtors' restructuring counsels states: "[lead restructuring counsel] wants us to call the GC of DSI today [Defendant Yalowitz] to cover contracts, assets and in particular which liabilities exist at DSI Holding that they are looking to get rid of." Compl. ¶ 90(e).

- A January 10, 2010 email expresses concern about providing information concerning the restructuring to the attorney representing the trustee in the Tennessee Bankruptcy Case because, "I don't want to open up a can of worms in terms of him thinking that DSI Holding did not get adequate value through this process . . . ." Compl. ¶ 90(o).

- An April 1, 2010 email from the Bucks County Hospital's bankruptcy counsel states: "On our call today I understood you to say that the procurement system was set up such that every P[urchase]O[rder] was designated 'Bill to Holdco' (regardless of whether it was a Renal or Hospital purchase.)" Compl. ¶ 43 n.2.

- An April 15, 2010 email to Bucks County's bankruptcy counsel addresses the issue of "offering a settlement now after [a creditor] raised the corporate veil theory" and states that, "The original plan was to kill DSI Holding but that plan has been put off." Compl. ¶ 90(q).

- An August 26, 2010 email to Debtor's outside counsel expresses concern about creditors of the Debtor seeking to recover from DSI Renal on a veil piercing theory and wanting to preserve the ability to upstream money from the Renal Business to the Debtor to hide that the money was coming from DSI Renal: "We have some situations where Bucks County vendors are seeking recovery from DSI Holding and DSI Renal []. I wouldn't want to be precluded from paying them from DSI Holding so as to keep DSI Renal out of it." Compl. ¶ 90(s).

- An August 26, 2010, email to Debtor's outside counsel states, "at some point it is possible that we will have DSI Renal fund monies up to DSI Holding to fund the litigation [against the Debtor] (alternatively we may just have DSI Renal directly pay some expenses)." Compl. ¶ 90(t).

- "Defendants Murphy and Yalowitz received millions of dollars of bonuses for their roles in facilitating and implementing the DSI Restructuring and DaVita Merger Transaction . . . ." Compl. ¶ 134.

- Defendant Yalowitz received 135 shares in CDSI I, then received $1,846,500.04 in the DaVita Merger Transaction. Compl. ¶ 87.

## DISCUSSION

### Standard for Evaluating a Motion to Dismiss

Federal Rule of Civil Procedure 12(b)(6), made applicable here by Fed. R. Bankr. P. 7012(b)(6), governs a motion to dismiss for failing to state a claim upon which relief can be granted. "The purpose of a motion to dismiss is to test the sufficiency of a complaint, not to resolve disputed facts or decide the merits of the case."[19] When reviewing a motion to dismiss, the court will construe the complaint "in the light most favorable to the plaintiff."[20] The court will "therefore accept all factual allegations in the complaint as true and give the pleader the benefit of all reasonable inferences that can be fairly drawn therefrom."[21] "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."[22]

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[23] Although a complaint challenged by a Rule 12(b)(6) motion to dismiss need not contain detailed factual allegations, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level."[24]

---

[19] *Paul v. Intel Corp. (In re Intel Corp. Microprocessor Antitrust Litig.)*, 496 F. Supp. 2d 404, 407 (D. Del. 2007) (citing *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993)).

[20] *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 220 (3d Cir. 2011) (quoting *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 314 (3d Cir. 2010)).

[21] *Kost*, 1 F.3d at 183.

[22] *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *abrogated on other grounds by Harlow v. Fitzgerald*, 457 U.S. 800 (1982); *see also Rosener v. Majestic Mgmt. Inc. (In re OODC, LLC)*, 321 B.R. 128, 134 (Bankr. D. Del. 2005) ("Granting a motion to dismiss is a 'disfavored practice.'").

[23] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

[24] *Twombly*, 550 U.S. at 555 (citations omitted).

The Court of Appeals for the Third Circuit has outlined a three-step process to determine the sufficiency of a complaint under *Twombly* and *Iqbal*:

> First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."[25]

The relevant record under consideration consists of the complaint and any "document integral or explicitly relied on in the complaint."[26] When considering a motion to dismiss, "it is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss."[27] The movant carries the burden of demonstrating that dismissal is appropriate.[28]

## A. **Count 1: Actual Fraudulent Transfers Pursuant to 11 U.S.C. § 548(a)(1)(A)**

Count 1 seeks to avoid transfers made with actual intent to hinder, delay and defraud creditors pursuant to 11 U.S.C. § 548(a)(1)(A), which provides that the trustee may avoid any transfer:

> of an interest of the debtor in property, or any obligation . . . incurred by the debtor, that was made or incurred within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily . . . made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any [creditor].[29]

---

[25]*Burtch*, 662 F.3d at 221 (quoting *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010)); *see also Great Western Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 177 (3d Cir. 2010).

[26] *U.S. Express Lines, Ltd. v. Higgins*, 281 F.3d 383, 388 (3d Cir. 2002) (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997)).

[27] *Commonwealth of Pa., ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988) (quoting *Car Carriers v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir. 1984), *cert. denied*, 470 U.S. 1054 (1984)).

[28] *Intel Corp.*, 496 F.Supp.2d at 408. Constructive fraudulent transfer claims are evaluated at the Rule 12(b)(6) stage under Rule 8(a). *Mervyn's LLC v. Lubert-Adler Group IV, LLC (In re Mervyn's Holdings, LLC)*, 426 B.R. 488, 495 n.5 (Bankr. D. Del. 2010).

[29] 11 U.S.C. § 548(a)(1)(A).

"This provision aims to make available to creditors those assets of the debtor that are rightfully a part of the bankruptcy estate, even if they have been transferred away."[30]

The Defendants argue that the Plaintiff alleges intentional fraud without identifying the requisite details about each transfer and, therefore, Count 1 fails to meet the pleading requirements of Rule 9(b).[31]  The purpose of Rule 9(b) is to "place the defendants on notice of the precise misconduct with which they are charged."[32]  However, Rule 9(b) is interpreted liberally in the bankruptcy context, particularly when the plaintiff is a third party, such as a trustee, because a third party generally has less information on which to base its allegations.[33]

Because actual intent to defraud is often difficult to prove, courts may rely on circumstantial evidence or "badges of fraud" to infer actual fraudulent intent.[34]  Those "badges of fraud" include: (1) a close relationship among the parties to the transaction; (2) a secret and hasty transfer not in the usual course of business; (3) inadequacy of consideration; (4) the transferor's knowledge of the creditor's claim and the transferor's inability to pay it; (5) the use of dummies or fictitious parties; and (6) retention of control of property by the transferor after the conveyance.[35]  While "consideration" is an issue when analyzing constructive fraud, a claim for actual fraud under

---

[30] *See Pension Transfer Corp. v. Beneficiaries under the Third Amendment to Fruehauf Trailer Corp. Retirement Plan No. 003 (In re Fruehauf Trailer Corp.)*, 444 F.3d 203, 210 (3d Cir. 2006).

[31] Fed. R. Civ. P. 9(b), made applicable here by Fed. R. Bankr. P. 7009, provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."

[32] *Rosener v. Majestic Mgmt. Inc. (In re OODC, LLC)*, 321 B.R. 128, 140 (Bankr. D. Del. 2005) (quoting *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir. 1984) *abrogated in part on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)).

[33] *OODC*, 321 B.R. at 140; *Pardo v. Gonzaba (In re APF Co.)*, 308 B.R. 183, 188 (Bankr. D. Del. 2004).

[34] *OODC*, 321 B.R. at 140; *see also Autobacs Strauss v. Autobacs Seven Co. (In re Autobacs Strauss, Inc.)*, 473 B.R. 525, 565 (Bankr. D. Del. 2012).

[35] *OODC*, 321 B.R. at 140 (quoting *MFS/Sun Life Trust - High Yield Series v. Van Dusen Airport Services Co.*, 910 F. Supp. 913, 935 (S.D.N.Y. 1995)).

-19-

§ 548(a)(1)(A) need not contain allegations about the value of consideration received by the debtor in the transaction.[36]

Here, through reference to numerous internal documents belonging to DSI or CDSI, the Trustee alleges with great specificity the fraudulent scheme, the parties' intent, and the transfers undertaken with the express goal of shielding Renal Business assets from creditors. Compl. ¶ 90(a)-(t). The documents and testimony referenced in the Complaint often reflect the explicit intent to hinder or delay creditors. Compl. ¶¶ 90-91. The Complaint alleges that the parties involved intended to defraud outside creditors by using the Goldman Sachs sale process to set a low value to justify the transfer and sale of DSI Renal, which, in turn, favored inside creditors. Compl. ¶¶ 60-70. Several documents referred to in the Complaint evince secrecy, haste, and concealment. *See, e.g.*, Compl. ¶¶ 52, 53, 90(m), (r). The Trustee includes charts in the Complaint listing the transfers of stock and funds that he seeks to avoid with the requisite particularity to place the Defendants on notice of the specific misconduct charged. Compl. ¶ 87.

The Trustee aims to reverse two specific sets of transfers: (1) transfers to the Defendants of stock in CDSI I which, while made in reverse order before CDSI I had any assets, effectively transferred the Renal Business through DSI Holding's transfer of its 100% ownership of DSI Renal to CDSI I during the DSI Rstructuring; and (2) the payments made to the Defendants as a result of the $700 million sale to DaVita. *Id.* The Trustee also alleges that an earlier maneuver in the same overall scheme - - the Bucks County Hospital's chapter 7 bankruptcy filing in Tennessee - - defrauded creditors by filing intentionally materially false schedules in that case to escape liability

---

[36] *See, e.g., In re Metro Shippers, Inc.*, 78 B.R. 747, 752 (Bankr. E.D. Pa. 1987) ("where a conveyance is made with the requisite actual intent, the factor of fair consideration is immaterial" (quoting 4 Collier on Bankruptcy ¶ 548.02 at 548-51 (15th ed. 1985)); *Brandt v. Leasing One Corp. (In re Equip. Acquisition Res., Inc.)*, 481 B.R. 433, 440 (Bankr. N.D. Ill. 2012) ("unlike transfers that are only constructively fraudulent, the equivalence of value given in exchange for the actual intent fraudulent transfer is immaterial to the question whether the transfer is actually fraudulent.").

for guarantees made to the hospital's creditors. Compl. ¶¶ 42-56. In addition to the guarantees, the Trustee argues, under an alter ego theory, that DSI Holding was responsible for the claims of all of the hospital's creditors, because the parent routinely ignored corporate boundaries and issued purchase orders to vendors, paid bills, controlled hospital personnel, and commingled funds (along with those of other affiliates). Compl. ¶ 43.

The Defendants argue that the fraudulent transfer claim fails because transfers of CDSI I stock do not constitute transfers of property belonging to the Debtors.[37] The Bankruptcy Code broadly defines estate property as encompassing "all legal or equitable interests of the debtor in property."[38] Estate property includes contingent interests and future interests, whether or not transferable by the debtor.[39] The Bankruptcy Code defines "transfer" as: "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or an interest in property."[40]

When assessing a defendant's fraudulent transfer liability, the Third Circuit has recognized that multi-step transactions may be collapsed and treated as one integrated transaction.[41] Deciding whether to collapse transactions is a fact-intensive exercise, and courts have been reluctant to solve collapsible transaction issues at the motion to dismiss stage.[42] "To determine whether a series of transactions should be 'collapsed' and viewed as a single integrated transaction, courts focus on

---

[37] Defs. Joint Mem. 11.

[38] 11 U.S.C. § 541(a)(1).

[39] See In re Fruehauf Trailer Corp., 444 F.3d at 211.

[40] 11 U.S.C. § 101(54)(D).

[41] See Official Comm. of Unsecured Creditors v. The CIT Group/Business Credit, Inc. (In re Jevic Holding Corp.), Case No. 08-11006 (BLS), Adv. No. 08-51903, 2011 WL 4345204, at *4 (Bankr. D. Del. Sept. 15, 2011) (citing, inter alia, U.S. v. Tabor Court Realty Corp., 803 F.2d 1288, 1301-03 (3d Cir. 1986)).

[42] See Official Comm. Of Unsecured Creditors v. Fleet Retail Fin. Grp. (In re Hechinger Inv. Co. of Del.), 274 B.R. 71, 91 (D. Del. 2002).

the substance rather than on the form of the transactions and consider the overall intent and impact of the transactions."[43]

In collapsing transactions, courts consider: (1) whether all the parties involved had knowledge of the multiple transactions; (2) whether each transaction would have occurred on its own; and (3) whether each transaction was conditioned or dependent upon the other transactions.[44] "While the transactions that are sought to be collapsed may be structurally independent and distinct from one another, courts focus their analysis 'not on the structure of the transaction but the knowledge and intent of the parties involved in the transaction.'"[45] Courts will consider the collapse of a series of transactions upon a showing that the transactions were part of an overall scheme to defraud the estate and its creditors by depleting assets through a restructuring.[46]

The creation of an intermediary corporation does not insulate the defendants from liability for fraudulent transfers.[47] Additionally, the Third Circuit has held that a fraudulent transfer can occur when employees, customer base, and physical assets are subsumed by another entity.[48] The circumstances surrounding the debtor's demise and the new entity's ascendance matter more than the classification of each transfer.[49] "[I]f one acts with knowledge that creditors will be hindered or delayed by a transfer but then intentionally enters the transaction in disregard of this fact, he acts with actual intent to hinder and delay them."[50]

---

[43] *Jevic Holding Corp.*, 2011 WL 4345204, at *5.
[44] *Mervyn's v. Lubert-Adler Group IV, LLC (In re Mervyn's Holdings, LLC)*, 426 B.R. 488, 497 (Bankr. D. Del. 2010).
[45] *Jevic Holding Corp.*, 2011 WL 4345204, at *5 (quoting *Hechinger Inv. Co*, 274 B.R. at 91).
[46] *See id.*
[47] *See Indus. Enters. of Am., Inc. v. Tabor Acad. (In re Pitt Penn Holding Co., Inc.)*, Case No. 09-11475 (BLS), Adv. No. 11-51879, 2011 WL 4352373, at *5 (Bankr. D. Del. Sept. 16, 2011).
[48] *See Dobin v. Taiwan Mach. Trade Ctr. Corp. (In re Victor Int'l, Inc.)*, 97 F. App'x 365, 368-69 (3d Cir. 2004).
[49] *See id.*
[50] *See ASARCO LLC v. Ams. Mining Corp.*, 396 B.R. 278, 387 (S.D. Tex. 2008) (applying Delaware law).

The Trustee provided numerous examples, for present purposes accepted as true, that sufficiently allege the parties' fraudulent intent to strip the Debtors of their assets through the creation of an intermediary, CDSI I. Compl. ¶¶ 90-91. Defendant Schnabel's alleged strategy to sever the link between the Debtors' liabilities and the corporate structure's only remaining assets (the Renal Business) to escape liability on the guarantor claims and the Bucks County Hospital's vendor claims, depicts a fraudulent scheme. Compl. ¶ 91(a)-(b).

Although the NML Defendants, Ares, and Apollo are not mentioned by name in the Complaint as knowing that the DSI Restructuring was being carried out with the aim to hinder, delay, or defraud creditors, the Complaint's allegations support inferences that all of the new investors and existing creditors transferring to equity *were aware* of the scheme, and *knowingly participated* in actions which hindered, delayed, or defrauded creditors. During sworn testimony, Defendant Schnabel: (1) acknowledged that the motivation for the DSI Restructuring was to isolate the Renal Business assets and leave behind the DSI Holding/DSI Renal Holdings guaranty liabilities, (2) stated that, to his knowledge, everybody (*i.e.,* all the parties involved) knew the motivation; and (3) stated that "there was no desire on the part of the new investors or the creditors who were transferring to equity to take on any liabilities that were not associated with the ongoing operations of the Renal Business." Compl. ¶ 91(a)(2)-(3). Testimony of outside counsel to DSI Renal Holdings/DSI Holding acknowledged that he was the author of a September 2, 2009 email stating that, "To get around these guarantee obligations, Centre and a subset of existing DSI investors are contemplating putting funds into a new entity . . . ." Compl. ¶¶ 90(a), 91(c)(1). The same unnamed counsel then recalled that "there was a concern that if we were to put money in at DSI Holding Company, then the existing trade creditors would have access to it." Compl. ¶ 91(c)(2).

If the multiple transactions at issue are viewed as a single integrated transaction, the facts as pled are sufficient to support an inference that the Defendants moved DSI Renal Holdings/DSI Holding's assets through an intermediary with actual intent to hinder, delay, or defraud non-insider creditors. The Complaint adequately pleads a fraudulent scheme, the parties' intent and involvement, the expressed goal of shielding DSI Renal assets from creditors, and is supported by reference to numerous internal documents belonging to the DSI entities, deposition testimony and exhibits detailing the relevant transfers. Accordingly, Count 1 satisfies the Rule 9(b) standard. Therefore, the Trustee has properly alleged that the Transfers constitute avoidable intentional fraudulent transfers pursuant to 11 U.S.C. § 548(a)(1)(A). The Motions to Dismiss Count 1 will be denied.

### B. Counts 2 and 3: Fraudulent Transfers Pursuant to 11 U.S.C. § 548(a)(1)(B) and 6 Del. C. §§ 1304 & 1305 Pursuant to 11 U.S.C. § 544

Counts 2 and 3 of the Complaint seek to avoid constructive fraudulent transfers pursuant to Bankruptcy Code 11 U.S.C. § 548(a)(1)(B), and fraudulent transfers pursuant to 11 U.S.C. § 544 and applicable non-bankruptcy law. The Defendants argue that the Transfers are not avoidable under Counts 2 and 3 due to the safe harbor provision of Bankruptcy Code 11 U.S.C. § 546(e), which provides:

> *Notwithstanding sections 544,* 545, 547, *548(a)(1)(B),* and 548(b) of this title, the trustee may not avoid a transfer that is . . . a settlement payment, as defined in section 101 or 741 of this title, made by or to (or for the benefit of) a . . . financial institution . . . or that is a transfer made by or to (or for the benefit of) a . . . financial institution . . ., in connection with a securities contract, as defined in section 741(7), . . . that is made before the commencement of the case, *except under section 548(a)(1)(A) of this title.*[51]

The Defendants argue that the transfers at issue relating to the DSI Restructuring fall under the protection of § 546(e) because the alleged transfers were (i) settlement payments to or for the

---

[51] 11 U.S.C. § 546(e) (emphasis added).

benefit of financial institutions or financial participants; or (ii) transfers made by or to a financial institution or participant in connection with a securities contract. The Trustee argues that § 546(e) does not apply to the DSI Restructuring because it was one-sided, and the assets were transferred for virtually no consideration. In such situations some courts have refused to apply § 546(e).[52]

On May 1, 2017, the United States Supreme Court granted *certiorari* to review the decision of the United States Court of Appeals for the Seventh Circuit in *FTI Consulting, Inc. v. Merit Management Group, LP ("Merit Management"),* [53] which may resolve a split among circuit courts (including the Third Circuit) regarding the issue of whether the safe harbor of § 546(e) "protects transfers that are simply conducted *through* financial institutions (or the other entities named in section 546(e)), where the entity is neither the debtor nor the transferee but only the conduit."[54]

The Defendants rely on the Third Circuit case law rejecting the argument that § 546(e) requires the financial institution to acquire a beneficial interest in the shares.[55] "So long as a financial institution is involved, the payment is an unavoidable 'settlement payment.'"[56] The requirement is satisfied by a wire transfer from a bank.[57] Federal regulations "require that a wire transfer *must* be performed by a bank; thus, a wire transfer must be made through a financial institution."[58]

---

[52] *See, e.g., Michaelson v. Farmer (In re Appleseed's Intermediate Holdings, LLC)*, 470 B.R. 289, 302 (D. Del. 2012); *Mervyn's Holdings*, 426 B.R. at 500.

[53] *Merit Mgmt. Grp. v. FTI Consulting, Inc.*, 830 F.3d 690 (7th Cir. 2016) *cert. granted* 137 S.Ct. 2092, 197 L.Ed.2d 894 (U.S. May 1, 2017) (No. 16-784).

[54] *Merit Mgmt.,* 830 F.3d at 691.

[55] *Lowenschuss v. Resorts Int'l, Inc. (In re Resorts, Int'l, Inc.),* 181 F.3d 505, 516 (3d Cir. 1999).

[56] *Hechinger Inv. Co.*, 274 B.R. at 87.

[57] *See Resorts Int'l,* 181 F.3d at 515.

[58] *Mervyn's Holdings*, 426 B.R. at 499-500 (citing *Loranger Mfg. Corp. v. PNC Bank (In re Loranger Mfg. Corp.),* 324 B.R. 575, 585 (Bankr. W.D. Pa. 2005) (taking judicial notice of federal regulation requiring that a wire transfer must be accomplished by a bank)).

Because the Motion to Dismiss requires consideration of similar issues about § 546(e) as those raised in *Merit Management*, I will defer consideration of the Defendants' request to dismiss Counts 2 and 3  pending a decision by the United States Supreme Court in *Merit Management*.

### C.  Count 4: Recovery of Transfers under 11 U.S.C. § 550

Count 4 seeks recovery of fraudulent transfers under 11 U.S.C. § 550. Section 550 provides, in pertinent part:

> (a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544 . . . [or] 548, . . . of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—
> > (1)    the initial transferee of such transfer or the entity for whose benefits such transfer was made; or
> > (2)    any immediate or mediate transferee of such initial transferee.
>
> (b) The trustee may not recover under section (a)(2) of this section from—
> > (1)    a transferee that takes for value, . . . in good faith, and without knowledge of the voidability of the transfer avoided; or
> > (2)    any immediate or mediate good faith transferee of such transferee.[59]

The § 550 claim thus depends on the viability of a successful fraudulent transfer claim under § 548.  Because the Motions to Dismiss will be denied for Count 1, but deferred for Counts 2 and 3, the Motions to Dismiss Count 4 will be denied as they apply to Count 1, and will be deferred as they apply to Counts 2 and 3.

### D.  Count 5 – Breach of Fiduciary Duties

In Count 5, the Trustee asserts breach of fiduciary duty claims against the D&O Defendants and the Centre Defendants. A corporation's directors and officers are fiduciaries of the company.[60] Among the duties owed by a fiduciary are the duties of loyalty, good faith, and care.[61]

---

[59] 11 U.S.C. § 550.
[60] *See Gantler v. Stephens*, 965 A.2d 695, 708-09 (Del. 2009).
[61] *See Emerald Partners v. Berlin*, 787 A.2d 85, 90 (Del. 2001).

(1)     Fiduciary Duties

The duty of loyalty obligates corporate fiduciaries to commit themselves to the business of the corporation with the attitude of promoting the corporation's interests, not their own.[62] A director is considered to be "interested" if he stands on both sides of the transaction or if he looks to derive a personal financial benefit from the transaction.[63] "The fiduciary duty of loyalty is not limited to cases involving a financial or other cognizable fiduciary conflict of interest," but may also include a failure to act in good faith.[64] "A director cannot act loyally towards the corporation unless she acts in the good faith belief that her actions are in the corporation's best interest."[65]

"The duty of care has been described as the duty to act on an informed basis."[66] "Representation of the financial interests of others imposes on a director an affirmative duty to protect those interests and to proceed with a critical eye in assessing information."[67] When analyzing a claim for breach of the duty of care, Delaware courts apply a standard of gross negligence, which has been defined as "reckless indifference to or a deliberate disregard of the whole body of stockholders or actions which are without the bounds of reason."[68]

The fiduciary duties of officers are the same as those of directors.[69] To state a claim against an officer for breach of fiduciary duty, the complaint must allege facts demonstrating that the

---

[62] *See Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993) *modified* 636 A.2d 956 (Del. 1994).

[63] *See ASARCO*, 396 B.R. at 405 (applying Delaware law).

[64] *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006).

[65] *Id.* (quoting *Guttman v. Huang*, 823 A.2d 492, 506 n. 34 (Del. Ch. 2003)).

[66] *Burtch v. Huston (In re USDigital, Inc.)*, 443 B.R. 22, 41 (Bankr. D. Del. 2011) (quoting *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993).

[67] *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985) *overruled, in part, on other grounds by Gantler v. Stephens*, 965 A.2d 695, 714 n. 54 (Del. 2009).

[68] *Benihana of Tokyo, Inc. v. Benihana, Inc.* 891 A.2d 150, 192 (Del. Ch. 2005).

[69] *Gantler*, 965 A.2d 695 at 708-09.

officer: (1) took part in the challenged conduct; and (2) failed to demonstrate the due care attendant to his particular office in doing so.[70]

 (2) <u>Fiduciary Duties and Collapsing Transactions</u>

  As a threshold matter, acts constituting breaches of fiduciary duty may be examined in isolation, or under the same collapsible transaction analysis employed in review of Count 1. Deciding whether to collapse transactions is a fact-intensive exercise, and courts have been reluctant to solve collapsible transaction issues at the motion to dismiss stage.[71] In one *Hechinger* decision (one of many opinions issued during extensive proceedings), the court denied a motion to dismiss all breach of fiduciary duty counts, stating:

> At this stage of the case, the court is reluctant to conclude that because the defendants structured the set of transactions in a certain manner, they are immune from a claim of breach of fiduciary duty, especially where the Committee alleges that the harms it complains of were foreseeable results of the acts of the defendants. Therefore, the court concludes that for any of the following reasons, the Hechinger Defendants' motion to dismiss the fiduciary duty claims against them must be rejected: (i) it is alleged that the approval of the Builders Square Merger was an independent harm that constituted a breach of fiduciary duty; (ii) the court cannot at this point say that the Builders Square acquisition and Hechinger LBO are not collapsible into one integrated transaction; (iii) even if the transactions are found on a more complete record to not be collapsible, the Committee has nonetheless stated a cause of action for breach of fiduciary duty based on the foreseeability of the alleged harm. Accordingly, the court will deny the Hechinger Defendants' motion to dismiss.[72]

A similar set of difficulties could be said to apply to issues surrounding the series of events described in the Trustee's Complaint. For the same reasons, I will deny the motion to dismiss

---

[70] *See Burtch v. Owlstone, Inc. (In re Advance Nanotech, Inc.)*, Case No. 11–10776, Adv. No. 13-51215, 2014 WL 1320145, at *6 (Bankr. D. Del. Apr. 2, 2014) (citing *Bridgeport Holdings Inc. Liquidating Trust v. Boyer (In re Bridgeport Holdings, Inc.)*, 388 B.R. 548 (Bankr. D. Del. 2008)).

[71] *Official Comm. of Unsecured Creditors v. Fleet Retail Fin. Grp. (In re Hechinger Inv. Co. of Del.)*, 274 B.R. 71, 91 (D. Del. 2002).

[72] *Id.*

Count 5 in light of outstanding issues involving the Tennessee Bankruptcy Case and the DSI

Restructuring, along with allegations about the foreseeability of the alleged harm.

      (3)    Exculpation and Business Judgment Rule Defenses

      The D&O Defendants also raise exculpation and business judgment rule defenses to the

Count 5 claims. An exculpatory clause is an affirmative defense and cannot form the basis of a

Rule 12(b)(6) dismissal.[73] *The Brown Schools* decision also holds that "the application of the

business judgment rule is an affirmative defense, the determination of which is not proper at the

motion to dismiss stage."[74] However, "[a] complaint may be dismissed under Rule 12(b)(6) where

an unanswered affirmative defense appears on its face" and, in that instance, to survive a motion

to dismiss, a plaintiff must "plead around the business judgment rule."[75] A plaintiff can rebut the

presumptive protection afforded by the business judgment rule by showing that "the board of

directors, in reaching its challenged decision, violated any one of its triad of fiduciary duties: due

care, loyalty, or good faith."[76]

      A plaintiff must meet the pleading requirements of Fed. R. Civ. P. 8(a) in stating state law

claims for breach of fiduciary duties.[77] Here, the Trustee alleges that the D&O Defendants and

the Centre Defendants breached their fiduciary duties to the Debtors and creditors by engaging in

self-interested and wrongful conduct, including (a) orchestrating and implementing the DSI

---

[73] *See Miller v. McCown De Leeuw & Co. (In re The Brown Sch.)*, 368 B.R. 394, 401 (Bankr. D. Del. 2007).

[74] *Id.*

[75] *Joseph v. Frank (In re Troll Commc'n, LLC)*, 385 B.R. 110, 118 & n.14 (Bankr. D. Del. 2008) (citing *Stanziale v. Nachtomi (In re Tower Air, Inc.)*, 416 F.3d. 229, 238 (3d Cir. 2005)).

[76] *Troll Commc'n*, 385 B.R. at 118 (citing *Emerald Partners v. Berlin*, 787 A.2d 85, 91 (Del. 2001)).

[77] Fed. R. Civ. P. 8(a), made applicable pursuant to Fed. R. Bankr. P. 7008, provides that a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief . . . ." *See also Miller v. Greenwich Capital Fin. Prods., Inc. (In re Am. Bus. Fin. Serv., Inc.)*, 362 B.R. 135, 145 (Bankr. D. Del. 2007) ("Federal Courts sitting in Delaware generally do not apply the Rule 9(b) pleading requirements to state law claims for breach of fiduciary duty. . . . Therefore, the Trustee is only required to meet the pleading requirements of Rule 8(a).") (citing *In re Fruehauf Trailer Corp.*, 250 B.R. 168, 197-98 (D. Del. 2000)).

Restructuring, which included fraudulent transfers, (b) using a sham sale process to justify a low valuation to support the DSI Restructuring, (c) filing intentionally materially false schedules in the Tennessee Bankruptcy Case and misleading the court and Tennessee Trustee in that bankruptcy case, and (d) misusing the Tennessee Bankruptcy Case as part of a scheme to facilitate the DSI Restructuring. Compl. ¶ 132. Viewing these allegations in the light most favorable to the Trustee, the Defendants' wrongful conduct was intentional, reckless, or grossly negligent. Compl. ¶ 133.

The allegations also support inferences that the Defendants' breached the duty of loyalty by, *inter alia*, engaging in a self-interested decision-making process, or by acting with gross negligence, when the Defendants failed to seek the highest value reasonably available for the company during the first Goldman Sachs sales process, specifically, by basing the company's value on depressed past performance rather than more positive projections. The allegations further support inferences that the Defendants breached their duties of loyalty and good faith by, *inter alia*, stripping DSI Holding/DSI Renal Holdings of its only asset, leaving it an empty shell, and profiting individually from their actions. The Trustee includes specific allegations of self-interest with regard to stock and cash bonuses received by Defendants Murphy and Yalowitz in connection with the series of transactions. Compl. ¶¶ 87, 134. Reviewing these allegations with reasonable inferences in favor of the Trustee, the Trustee has alleged sufficient facts to "plead around" the business judgment rule and the exculpation clauses and state plausible breach of fiduciary duty claims.

Director Defendants Schnabel and Pollack are alleged to be insiders of the Centre Defendants. Compl. ¶¶ 10-11. The Debtors' boards are alleged to have had no "independent" directors. Compl. ¶ 16. The presence of the Centre Defendants on both sides of the transaction, combined with the charge that the Centre Defendants were exercising control over the affairs of

DSI Holding/DSI Renal Holdings' board and, more specifically, the restructuring process, alleges

sufficiently breach of the fiduciary duties of loyalty and good faith. The Trustee has not alleged

specific amounts of stock received by Schnabel and Pollack - - nor does he need to at this stage of

the proceedings given the surrounding plausibly pled scheme.

With regard to Defendant Yalowitz, former secretary and general counsel to DSI Renal

Holdings/DSI Holding, secretary to DSI Hospitals, and secretary of DSI Renal, the Complaint

contains factual allegations and reference to internal documents that sufficiently support his direct

participation in the challenged conduct, failure to demonstrate the due care attendant to his

particular office in doing so, and receipt of a personal benefit from his involvement. Compl. ¶¶ 15,

52, 87, 90(e), (o), (q), (s), (t), 134.

    (4)    The Centre Defendants

"[A] shareholder owes a fiduciary duty only if it owns a majority interest in or *exercises*

*control* over the business affairs of the corporation."[78]

> [A] shareholder who owns less than 50% of a corporation's outstanding stocks does
> not, without more, become a controlling shareholder of that corporation, with a
> concomitant fiduciary status. For a dominating relationship to exist in the absence
> of controlling stock ownership, a plaintiff must allege domination by a minority
> shareholder through actual control of corporation conduct.[79]

The Trustee asserts that the Centre Defendants also owed fiduciary duties to Debtors because they

formed a "control group" which exercised control over the business affairs of the companies. For

a "control group" to be treated the same as a single controlling stockholder, it must be "connected

in some legally significant way - - *e.g.,* by contract, common ownership, agreement or other

---

[78] *Kahn v. Lynch Commc'n Sys.*, 638 A.2d 1110, 1113 (Del. 1994) (quoting *Ivanhoe Partners v. Newmont Mining Corp.*, 535 A.2d 1334, 1344 (Del. 1987) (affirming the decision that a 43.3% minority shareholder owed the fiduciary duties of a controlling shareholder when it effectively controlled a corporation's management and board of directors)).

[79] *Citron v. Fairchild Camera & Instrument Corp.*, 569 A.2d 53, 70 (Del. 1989) (citations omitted).

arrangement - - to work together toward a shared goal."[80]  Whether a control group exists is a fact-intensive inquiry; some courts have been hesitant to make this determination in pre-trial motions.[81]

The Complaint alleges that the Centre Defendants controlled four out of five seats on the board of directors for DSI Holding and the Debtors. Compl. ¶ 30. Although controlling a majority of board seats may indicate board domination, this Complaint's conclusory statement is insufficient by itself, especially when only two of the five directors listed in the Complaint (Schnabel and Pollack) are alleged to be insiders of the Centre Defendants. Compl. ¶¶ 10-14. The Defendants further argue that the thirteen separate Centre Defendants are each an autonomous entity, and the Trustee has identified no overt agreement among those entities to defraud the creditors of DSI.[82]

However, when considering a motion to dismiss, courts will "construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."[83]  Here, the sources referenced in the Complaint allege sufficiently that the Centre Defendants worked together as one entity and exercised control over the Debtors, specifically as to driving the DSI Restructuring.

The Complaint alleges that the Centre Defendants directed the termination of the Goldman Sachs sale process. Compl. ¶ 66. The Trustee also alleges that the Centre Defendants developed the restructuring plan. Compl. ¶ 74. After the allegedly fraudulent restructuring, the Centre Defendants owned 49.1% of the stock of CDSI I. Compl. ¶ 87(1). The Centre Partners received a

---

[80] *Dubroff v. Wren Holdings*, 2009 WL 1478697, at *3 (Del. Ch. May 22, 2009).

[81] *Frank v. Elgamal*, 2014 WL 957550, at *18 (Del. Ch. Mar. 10, 2014) (citing *In re Nine Systems Corp. S'holders Litig.*, 2013 WL 771897, *6 (Del. Ch. Feb. 28, 2013)).

[82] Mem. of Law of Defendants Centre Partners, Murphy, Yalowitz, Pollack and Schnabel in Supp. of their Mot. to Dismiss Claims VI, VII & VII 10-11, Adv. D.I. 17.

[83] *Stanziale v. Versa Capital Mgmt., LLC (In re Simplexity, LLC)*, Adv. No. 16-50212, 2017 WL 65069, *3 (Bankr. D. Del. Jan. 5, 2017) (citing *Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)).

combined $161,981,086 from the DaVita Merger Transaction. Compl. ¶ 87(2). A September 9, 2009 email from Defendant Murphy indicates that the primary goal of the DSI Restructuring was to satisfy the Centre Defendants' objectives. Compl. ¶ 90(b). A September 30, 2009 email from DSI Renal Holdings/DSI Holding's lead restructuring counsel indicates that the restructuring was structured to effectuate the intent of the Centre Defendants. Compl. ¶ 90(d).[84] The Centre Defendants' insider board members saw several of the emails and other documents detailing a plan that would hinder, delay, or defraud creditors holding guarantees from the Debtor. Although the Centre Defendants did not hold a majority ownership of stock, the Complaint adequately alleges that the Centre Defendants acted as one concerted entity and exercised dominant control of the corporation, making the Centre Defendants insiders and subjecting them to the same fiduciary duties owed by the D&O Defendants.

The Motions to Dismiss Count 5 will be denied.

### E.  Count 6 – Aiding and Abetting a Breach of Fiduciary Duty

Under Delaware law, the four elements of an aiding and abetting a breach of fiduciary duty claim are "(1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, (3) knowing participation in that breach by the defendants, and (4) damages proximately caused by the breach."[85]

---

[84] The September 30, 2009 email states: "Centre wants to liquidate just the holding company [DSI Renal Holdings/DSI Holding] and do their new equity investment at a level below that, wiping out the claims of the creditors at holdings and thru the investment wiping out the equity interest of holdings in renal [DSI Renal]." Compl. ¶ 90(d).

[85] *In re Del Monte Foods Co. S'holders Litig.,* 25 A.3d 813, 836 (Del. Ch. 2011) (quoting *Malpiede v. Townson,* 780 A.2d 1075, 1096 (Del. 2001) (internal punctuation omitted)).

Fiduciaries cannot aid and abet their own breaches of fiduciary duty.[86]  However:

> Although the elements of a claim for aiding and abetting a breach of fiduciary duty count are couched in terms of the primary violator being a fiduciary and the aider and abettor a non-fiduciary, there is no case law that precludes such a claim against a fiduciary. While a corporate director owes the corporation fiduciary duties, in some instances those duties may be limited (by corporate charter or statute). Thus, the Court may find that a director had no fiduciary duty but aided and abetted a party that did.[87]

The Trustee alleges that, even in the absence of an owed fiduciary duty, "each such Defendant is nevertheless liable for having aided and abetted the breach of fiduciary duties by one or more of the other Defendants possessing such duties at the relevant times." Compl. ¶ 137.

At this stage in the proceedings, determination of the precise outer boundaries of each D&O Defendant's or Centre Defendant's fiduciary duties is premature. For example, the directors may prove to be shielded by their exculpatory clauses, but liable for assisting officer Defendant Yalowitz; Centre Partners may be determined to have no fiduciary duties, but could be held liable for aiding and abetting a breach of fiduciary duty by any D&O Defendant. According all reasonable inferences in favor of the Trustee, the Complaint adequately pleads the elements of aiding and abetting a breach of fiduciary duty as to all D&O Defendants and Centre Defendants.

"Knowing participation" is a critical element of a claim for aiding and abetting in a breach of fiduciary duty.[88]  The NML Defendants, Ares, and Apollo argue that the Complaint fails to state a claim against them for aiding and abetting fiduciary duties, particularly because the Complaint does not allege a "knowing participation" in the allegedly wrongful conduct.  They argue that the

---

[86] *See Cargill, Inc. v. JWH Special Circumstance LLC*, 959 A.2d 1096, 1125 (Del. Ch. 2008) (stating that a claim for "aiding and abetting a breach of fiduciary duty requires proof of four elements: (1) the existence of a fiduciary relationship; (2) the fiduciary breached its duty; (3) a defendant, *who is not a fiduciary*, knowingly participated in a breach; and (4) damages to the plaintiff resulted from the concerted action of the fiduciary and the *nonfiduciary*." (emphasis added)).

[87] *The Brown Sch.*, 368 B.R. at 402-03.

[88] *Del Monte Foods*, 25 A.3d at 836.

Trustee offers only one conclusory assertion in the Complaint that "Apollo, Ares, and the [NML] Defendants held DSI related debt. They approved the DSI Restructuring with knowledge of its fraudulent intent, and received fraudulent transfers in connection with that debt." Compl. ¶ 82. This, by itself, is not enough to pass the pleading requirements of Rule 8(a).

However, the Trustee asserts that testimony gained through discovery and referenced in the Complaint supports reasonable inferences that the NML Defendants, Ares, and Apollo knew that the underlying motivation of the DSI Restructuring was to isolate the Renal Business and leave behind DSI Renal Holdings/DSI Holding's liabilities; in short, their knowledge that the fiduciaries were acting with reckless indifference to or deliberate disregard of the Debtors' creditors and shareholders, through the following:

     (i)     testimony of Defendant Schnabel that "everybody, . . . all the people involved knew that motivation" and, further, that "there was no desire on the part of the new investors or the creditors who were converting to equity to take on any liabilities that were not associated with the ongoing operations of the Renal business." Compl. ¶ 91(a)(2)-(3);

     (ii)     testimony of outside counsel to DSI Renal Holdings/DSI Holding acknowledging that he was the author of a September 2, 2009 email stating that, "To get around these guarantee obligations, Centre and a subset of existing DSI investors are contemplating putting funds into a new entity . . . ." Compl. ¶¶ 90(a), 91(c)(1);

     (iii)     testimony of the same outside counsel then recalled that "there was a concern that if we were to put money in at DSI Holding, then the existing trade creditors would have access to it." Compl. ¶ 91(c)(2).

Although the NML Defendants, Ares, and Apollo are not mentioned by name, the Complaint supports that all of the new investors and creditors transferring to equity were aware of

the scheme and knowingly participated in it. According all reasonable inferences to the Trustee at this stage of the proceeding, the Complaint states a claim for aiding and abetting a breach of fiduciary duty as to all the Defendants.

The Motions to Dismiss Count 6 will be denied for all Defendants.

## F. Count 7 – Corporate Waste

A corporate waste claim is asserted against the D&O Defendants and the Centre Defendants. Preliminarily, the Centre Defendants and Defendant Yalowitz move to dismiss themselves from the corporate waste claim, arguing that only *directors* may be liable for corporate waste and the Complaint does not allege that the Centre Defendants or Defendant Yalowitz are directors.[89] In support, the Defendants cite the Supreme Court of Delaware's opinion in *Walt Disney Co. Derivative Litig.*, which provides that "[a] claim of waste will arise only in the rare, 'unconscionable case where *directors* irrationally squander or give away corporate assets.'"[90] The Defendants, however, added their own emphasis to the term "directors" in the quoted language. The *Walt Disney* case does not discuss whether corporate waste claims may be brought against officers or controlling shareholders because the plaintiff in *Walt Disney* only asserted claims against directors who served at the time of the events in question.[91] On the other hand, the Trustee has not cited to (nor did I uncover) any cases in which the Delaware courts have determined that officers or controlling shareholders could be liable for corporate waste.[92] In the absence of

---

[89] Reply Mem. of Law of Defs. Centre Partners, Murphy, Yalowitz, Pollack and Schnabel in Further Supp. Of their Mot. To Dismiss Claims V, VI & VII (Adv. D.I. 20), 10.

[90] *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 74 (Del. 2006) (quoting *Brehm v. Eisner*, 746 A.2d 244, 263 (Del. 2000)) (emphasis added).

[91] *Walt Disney Co.*, 906 A.2d at 35.

[92] *See, generally, Sample v. Morgan*, 914 A.2d 647, 650 (Del. 2007) (corporate waste claim brought against directors of the company); *Brehm v. Eisner*, 746 A.2d 244, 264 (Del. 2000) (corporate waste claim brought against members of the new board of directors); *Calma on behalf of Citrix Sys., Inc. v. Templeton*, 114 A.3d 563, 570 (Del. Ch. 2015) (corporate waste claim asserted against nine members of Citrix's board of directors).

precedent from the Delaware courts, I will dismiss Count 7 against the Centre Defendants and
Defendant Yalowitz.

The remaining D&O Defendants argue that the Complaint fails to allege facts showing a
complete failure of consideration, not merely insufficient consideration, in the DSI Restructuring
transaction, as is required to support a corporate waste claim.[93] "Under Delaware law, directors
waste corporate assets when they approve a decision that cannot be attributed to 'any rational
business purpose.'"[94] A claim for corporate waste is "a residual protection for stockholders that
polices the outer boundaries of the broad field of discretion afforded directors by the business
judgment rule."[95] To state a claim for corporate waste, the Complaint must allege that the directors
"authorized an exchange that was so one-sided that no business person of ordinary, sound
judgment could conclude that the corporation has received adequate consideration."[96] "In
evaluating a waste claim, courts look to the exchange *itself* [rather than process]. The exchange
must be *irrational*."[97] "Waste is a standard rarely satisfied in Delaware courts."[98]

However, the Trustee in this case, accorded all inferences, adequately alleges that the
Debtor's transfer of its interest in DSI Renal (viewed as one continuous collapsed transaction)

---

[93] Reply Mem. of Law (Adv. D.I. 20) at 10 (citing *In re 3Com Corp. S'holders Litig.*, 1999 WL
1009210,*4 (Del. Ch. Oct. 25, 1999)).

[94] *Calma on behalf of Citrix Sys., Inc. v. Templeton*, 114 A.3d 563, 590 (Del. Ch. 2015) (citation
omitted).

[95] *Sample v. Morgan*, 914 A.2d 647, 669 (Del. Ch. 2007). The business judgment rule has been
described in Delaware case law as "a presumption that in making a business decision the directors of a
corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in
the best interests of the company. Therefore, the judgment of a properly functioning board will not be
second-guessed and absent an abuse of discretion, that judgment will be respected by the courts. Because
a board is presumed to have acted properly, the burden is on the party challenging the decision to establish
facts rebutting the presumption." *Orman v. Cullman*, 794 A.2d 5, 19-20 (Del. Ch. 2001) (citations and
internal punctuation omitted).

[96] *Citrix Sys.*, 114 A.3d at 590 (citing *Glazer v. Zapata Corp.*, 658 A.2d 176, 183 (Del. Ch. 1993)).

[97] *Official Comm. of Unsecured Creditors of Integrated Health Services, Inc. v. Elkins*, 2004 WL
1949290, *17 (Del. Ch. Aug. 24, 2004) (emphasis in original).

[98] *Id.*

served no rational business purpose, and that no business person of ordinary sound judgment could conclude that DSI Renal Holdings/DSI Holding received adequate consideration in exchange for the transfers. The Trustee alleges that DSI Renal Holdings/DSI Holding was left an empty shell; its highly profitable Renal Business stripped away, in exchange for less than one-thousandth of a percent of an interest in the holding company now owning the business it formerly owned in full. Compl. ¶¶ 71- 85. The Complaint cites to internal documents showing that, at the time the transaction was undertaken, insiders knew that the Renal Business was returning to profitability and that Defendants did not want trade creditors or non-insider shareholders to benefit from those conditions. Compl. ¶¶ 75, 78-79, 91(a), 98. A January 10, 2010, email from Defendant Yalowitz expresses concern about providing information concerning the restructuring to the attorney representing the trustee in the Tennessee Bankruptcy Case because, "I don't want to open up a can of worms in terms of him thinking that DSI Holding did not get adequate value through this process . . . ." Compl. ¶ 90(o). Most troubling is a December 2, 2009 email from the Debtors' lead restructuring counsel (obtained by the Trustee during discovery) stating: "Think a fairness opinion would help here? I assumed you would never get [Goldman Sachs] to say the deal was 'fair' to the stockholder of dsi renal [the Debtor] as they are effectively getting wiped out—pretty tough opinion to give." Compl. ¶ 90(j).

As the Delaware Court of Chancery said in *Telxon Corp. v. Bogomolny*, "the terms and circumstances . . . appear at this point sufficiently unusual to require the court to allow the claim to survive beyond the pleading stage."[99] When a company's own restructuring counsel cannot imagine obtaining a fairness opinion, a reasonable inference can be drawn that no businessperson

---

[99] 792 A.2d 964, 976 (Del. Ch. 2001).

of ordinary sound judgment could believe that adequate consideration was received. Dismissal of the Trustee's corporate waste claim is premature at this juncture.

The Motions to Dismiss Count 7 will be granted as to the Centre Defendants and Defendant Yalowitz, but denied as to the remaining D&O Defendants.

## G. Count 8 – Declaratory Judgment

In Count 8 of the Complaint, the Trustee seeks:

> declaratory relief, including a declaratory judgment to the effect that: (a) CDSI I and CDSI II were the vehicles used by the Defendants to facilitate the fraudulent transfer of the Debtors' interest in DSI Renal; (b) Defendants CDSI I and CDSI II are the alter egos and successors of Debtor DSI Renal Holdings/DSI Holding; (c) Defendants CSDI I and CDSI II are liable for: (1) all of the debts of Debtors DSI Renal Holdings/DSI Holding, DSI Hospitals, and DSI Facility; and (2) all of the debts of non-debtor the Bucks County Hospital; and, (d) Debtor DSI Renal Holdings/DSI Holding is liable for all of the debts of debtors DSI Hospitals and DSI Facility and non-debtor the Bucks County Hospital. Compl. ¶ 144.

The Trustee voluntarily dismissed defendants CDSI I and CDSI II without prejudice on August 2, 2013, pursuant to Fed. R. Civ. P. 41(a)(1)(A)(i), and, as a result, the Trustee clarified at oral argument that he was no longer seeking to hold those entities liable for the debts of the Debtors or the Bucks County Hospital.[100]

The Defendants (correctly, I think) recast the remainder of Count 8 as claims by the Trustee for piercing the corporate veil/alter ego or substantive consolidation. The Defendants seek dismissal of those claims pursuant to Fed. R. Civ. P. 12(b)(1) and (6), made applicable by Fed. R. Bankr. P. 7012. First, the Defendants claim that the Trustee lacks standing to seek a declaratory judgment that DSI Renal Holdings/DSI Holding is liable for all the debts of Debtors DSI Hospitals

---

[100] Adv. D.I. 11. Tr. at 25 (Adv. D.I. 53). At oral argument the Defendants noted that, as part of the stipulation to dismiss CDSI I and CDSI II, the Defendants agreed not to argue that those entities were necessary parties to the litigation. Tr. at 15 (Adv. D.I. 53). While the Trustee may still argue that the Defendants used CDSI I and CDSI II as vehicles to facilitate the fraudulent transfer of the Debtor's interest in DSI Renal, any arguments about the Trustee's "reverse veil piercing" claim will not be addressed, as the claims against CDSI I and CSDI II are no longer being pursued.

and DSI Facility and non-debtor Bucks County Hospital; hence, this Court is without subject matter jurisdiction to entertain such a claim. Second, the Defendants contend that, even if the Trustee has standing, the Complaint's factual allegations do not support the veil piercing/alter ego and substantive consolidation claims underlying Count 8.

      1.    Standing- Veil Piercing/Alter Ego claim

The Defendants challenge the Trustee's standing to seek a declaratory judgment that DSI Renal Holdings/DSI Holding is liable for the claims of the non-debtor Bucks County Hospital. The Defendants argue that the Trustee does not have standing to assert claims that would render the Debtors and their bankruptcy estates *more* insolvent by taking on the liability of the Bucks County Hospital.

In response, the Trustee argues that the claims in Count 8 are a necessary part of performing his duties. He notes that Bankruptcy Code § 704 provides that a trustee shall "investigate the financial affairs of the debtor" and to "collect and reduce to money the property of the estate." Trustees have "a duty to maximize the value of the estate . . . and in so doing is bound to be vigilant and attentive in advancing [the estate's] interests."[101]

The Trustee also relies upon the Third Circuit decision recognizing that "a trustee has a fiduciary relationship with *all* creditors of the estate."[102] The Trustee asserts that, as a result of discovery pursuant to Fed. R. Bankr. P. 2004, he uncovered a potentially fraudulent scheme (Compl. ¶¶ 1-2, 55-56), and it is the Trustee's duty to recover the value of the Delaware estate's fraudulently transferred property on behalf of *all* creditors of the Delaware estate. The Trustee claims that if, in performing his duties, he finds that the Tennessee creditors were misled by

---

    [101] *Myers v. Martin (In re Martin)*, 91 F.3d 389, 394 (3d Cir. 1996) (citing *In re Baird*, 112 F. 960, 960 (E.D. Pa. 1902)).
    [102] *Martin*, 91 F.3d at 394 (emphasis in original) (citing *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 354-55, 105 S. Ct. 1986, 1993, 85 L.Ed.2d 372 (1985)).

intentionally materially false schedules filed in the Tennessee Bankruptcy Case under Defendants' direction and control (Compl. ¶¶ 47-50), the Trustee should not ignore those creditors, but should include those creditors in the Delaware Bankruptcy Case.

Although Bankruptcy Code § 501(c)[103] allows a trustee to file claims on behalf of creditors, the Defendants assert that any claim now filed by the Trustee on behalf of creditors, such as the Bucks County Hospital creditors, would be untimely under Fed. R. Bankr. P. 3004, which grants a trustee only thirty additional days to file a claim on behalf of a creditor that fails to file his or her claim within the ninety-day period allotted in Fed. R. Bankr. P. 3002. The Trustee points out that neither the Tennessee Trustee nor the Bucks County Hospital creditors knew that DSI Renal Holdings/DSI Holding were co-guarantors. At this stage in the proceeding, I cannot determine whether facts may develop that would allow tardy filing of claims.[104] However, a discussion of the Trustee's duties or ability to file a proof of claim on behalf of creditors does not address the underlying issue of whether the Trustee has standing to pursue a declaratory judgment on the liability of DSI Renal Holdings/DSI Holding to the creditors of Bucks County Hospital.

Bankruptcy Code § 541(a) provides that a bankruptcy estate consists of "all legal and equitable interests of the debtor in property as of the commencement of the case."[105] "This includes 'causes of action existing at the time the bankruptcy action commences.'"[106] "In addition, 11 U.S.C. § 323(a) provides that the trustee is the sole representative of [the] estate and 11 U.S.C. §323(b) of the Code provides that the trustee has the capacity to sue and be sued. . . . Taken

---

[103] 11 U.S.C. § 501(c) provides that "[i]f a creditor does not timely file a proof of such creditor's claim, the debtor or the trustee may file a proof of such claim."

[104] *See, e.g.,* 11 U.S.C. §§ 502(b)(9) and 726(a).

[105] 11 U.S.C. § 541(a)(1).

[106] *Miller v. Elway Co., LLP (In re Elrod Holdings Corp.),* 392 B.R. 110, 114 (Bankr. D. Del. 2008) (quoting *Anderson v. Acme Markets, Inc.,* 287 B.R. 624, 628 (E.D. Pa. 2002)).

together, § 323(a) and (b) grant the trustee the exclusive standing to assert causes of action that have become property of the estate by operation of § 541."[107]

"But property of the bankruptcy estate does not include claims for damages caused to individual creditors or stockholders of the debtor."[108]  In *Think3*, the court held that the Trustee did not have standing to assert claims on behalf of pre-merger stockholders who were allegedly harmed by the director defendants' purported misleading statements and omission of material facts in connection with a 2010 merger.[109]  The *Think3* Court also determined, however, that the Trustee could bring claims for damages suffered by the debtor corporation based on the same factual allegations.[110]  "The legal fiction of corporate existence corresponds with the view that an injury to the corporate body is legally distinct from an injury to another person. . . . [A] corporation can suffer an injury unto itself, and any claim it asserts to recover for that injury is independent and separate from the claims of shareholders, creditors, and others."[111]  This is often phrased as the difference between direct and derivative claims: trustees have standing to bring derivative claims (based on an injury to the corporation) as opposed to direct claims (based on an injury to the individual shareholder or creditor).  Under Delaware law, a court decides whether a claim is direct or derivative by considering "who suffered the alleged harm - - the corporation or the suing

---

[107] *Id.* (citations and internal punctuation omitted).
[108] *Think3 Litig. Trust v. Zuccarello (In re Think3, Inc.),* 529 B.R. 147, 187 (Bankr. W.D. Tex. 2015) (citing *Caplin v. Marine Midland Grace Trust Co.,* 406 U.S. 416, 433, 92 S. Ct. 1678, 32 L.Ed.2d 195 (1972) (bankruptcy trustee has no standing to sue for damages on behalf of debenture creditors of debtor under Bankruptcy Act); *Schertz-Cibolo-Universal City v. Wright (In re Educators Group Health Trust,* 25 F.3d 1281, 1284-85 (5th Cir. 1994) (under *Caplin,* if direct injury is caused to the debtor, trustee has standing to bring suit; if direct injury is caused to creditors that is not derivative of harm to the debtor, trustee does not have standing to bring suit.)).
[109] *Id.* at 186.
[110] *Id.* at 187.  The *Think3* Court decided that § 541(a)(1) gives a trustee "standing to bring a cause of action for damages suffered by a debtor corporation against corporate officers and directors for alleged misconduct and breach of fiduciary duties." *Id.*
[111] *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., Inc.,* 267 F.3d 340, 348 (3d Cir. 2001).

-42-

stockholder [or creditor] individually - - and who would receive the benefit of the recovery or other remedy?"[112]

The claim underlying Count 8 seeks a declaratory judgment that DSI Renal Holdings/DSI Holding is liable for the debts of the Bucks County Hospital; in short, alleging a corporate veil piercing claim on behalf of the creditors of a pre-merger subsidiary. This claim is not a derivative claim alleging damages suffered by the Debtor corporations, but a claim seeking a remedy for damages to a particular subset of creditors. The Trustee does not have standing to assert this claim.[113]

2.    Does the Complaint, in essence, call for Substantive Consolidation?

Count 8 also asserts that DSI Renal Holdings/DSI Holding should be liable for the claims of creditors of the related Debtors. The Defendants argue that the relief requested effectively would substantively consolidate the Debtors.

In *Owens Corning*, the Third Circuit described substantive consolidation as follows:

> Substantive consolidation, a construct of federal common law, emanates from equity. It "treats separate legal entities as if they were merged into a single survivor left with all the cumulative assets and liabilities (save for inter-entity liabilities, which are erased). The result is that claims of creditors against separate debtors morph to claim against the consolidated survivor." . . . Consolidation restructures (and thus revalues) rights of creditors and for certain creditors this may result in significantly less recovery. [114]

---

[112] *Stanziale v. Versa Capital Mgmt., LLC (In re Simplexity), LLC*, 2017 WL 2385404, *6 (Bankr. D. Del. June 1, 2017) (quoting *Tooley v. Donaldson, Lufkin & Jenette, Inc.*, 845 A.2d 1031, 1038-39 (Del. 2004)). *See also Williams v. McGreevey (In re Touch Am. Holdings, Inc.)*, 401 B.R. 107, 122 n. 26 (Bankr. D. Del. 2009).

[113] *See also Burtch v. Opus, LLC (In re Opus East, LLC)*, 480 B.R. 561, 575 (Bankr. D. Del. 2012) (holding that the Trustee did not have standing to assert a direct claim alleging that the debtor's wholly-owned subsidiary suffered an injury based on tortious interference with, or conversion of, the subsidiary's property and, further, that the Trustee failed to plead a derivative claim on behalf of the wholly-owned subsidiary).

[114] *In re Owens Corning*, 419 F.3d 195, 205 (3d Cir. 2010) (*quoting Genesis Health Ventures, Inc. v. Stapleton (In re Genesis Health Ventures, Inc.)*, 402 F.3d 416, 423 (3d Cir. 2005)).

Substantive consolidation is only appropriate by consent or if the party moving to substantively consolidate entities can prove that "(i) prepetition [the entities] disregarded separateness so significantly [that] their creditors relied on the breakdown of entity borders and treated them as one legal entity, or (ii) postpetition their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors."[115] Corporate disregard as a fault may lead to corporate disregard as a remedy.[116]

"Substantive consolidation has a profound effect on the assets of the consolidated entities" and an order may have a preclusive effect on the merits of other litigation. [117] Substantive consolidation may harm some creditors, so all creditors should have an opportunity to appear and be heard in a substantive consolidation action. Count 8 does not seek relief from the Defendants, but seeks a declaratory judgment that will impact all creditors. Considering the factual allegations and the stage of the litigation, this adversary proceeding does not appear to be an appropriate setting for consideration of a substantive consolidation claim, which, in any event, has not been expressly pled as such.

For the reasons set forth above, Count 8 will be dismissed.

**H.   Count 9 – Equitable Subordination**

The Trustee voluntarily withdrew this claim for equitable subordination under 11 U.S.C. § 510(c), without prejudice, during oral argument.[118]

---

[115] *Owens Corning,* 419 F.3d at 211 (footnotes omitted).
[116] *Id.* at 205 (citing Mary Elisabeth Kors, *Altered Egos: Deciphering Substantive Consolidation,* 59 U. Pitt. L. Rev. 381, 383 (1998)).
[117] *Id.* at 204.
[118] Adv. D.I. 53, at 7-8.

## CONCLUSION

For the reasons set forth above, I conclude as follows:

(i)        the Motions to Dismiss Counts 1, 5, and 6 will be denied;

(ii)       consideration of the Motions to Dismiss Counts 2 and 3 will be deferred;

(iii)      the Motions to Dismiss Count 4 will be denied, in part, to the extent recovery is

sought under Count 1, and deferred, in part, to the extent recovery is sought on Counts 2 and 3;

(iv)      the Motions to Dismiss Count 7 will be granted, in part, as to the Centre Defendants

and Defendant Yalowitz, and denied, in part, as to the remaining D&O Defendants; and

(v)       the Motions to Dismiss Count 8 will be granted.

Count 9 was withdrawn by the Trustee voluntarily and without prejudice.

An appropriate order will follow.


BY THE COURT:


_____
KEVIN J. CAREY
UNITED STATES BANKRUPTCY COURT


Dated:  July 20, 2017