# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| DSI RENAL HOLDINGS, LLC, *et al.*, | ) | Case No. 11-11722 (KBO) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| _____ | ) | |
| | ) | |
| ALFRED T. GIULIANO, Chapter 7 Trustee, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Proc. No. 14-50356 (KBO) |
| | ) | |
| MICHAEL SCHNABEL, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## OPINION[1]

Before the Court are the following motions for partial summary judgment filed by one or more of the Defendants in the above-captioned adversary proceeding commenced by Plaintiff Alfred T. Giuliano (the "Trustee"), as the chapter 7 trustee for the estates of DSI Renal Holdings, LLC, DSI Hospitals, Inc., and DSI Facility Development, LLC (each a "Debtor" and together the "Debtors"): (1) *Defendants' Motion For Partial Summary Judgment Excluding Proceeds Of Non-Debtor Property From Plaintiff's Potential Recovery*[2] (the "Stock Motion"); (2) *Motion Of Defendants Apollo Investment Corporation, Ares Capital Corporation, And Northwestern Mutual Life Insurance Company For Summary Judgment Excluding Debt Repayments From Plaintiffs' Recovery*[3] (the "Debt Motion", and together with the Stock Motion, the "Damages Motions"); and (3) *The Northwestern Mutual Life Insurance Company's Motion For Summary Judgment On Certain Of Plaintiff's Fraudulent Transfer Claims Pursuant To 11 U.S.C. § 546(e)*[4] (the "Safe Harbor Motion", and together with the Damages Motions, the "Motions"). For the reasons set forth herein, the Court will grant the Motions.

---

[1] This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

[2] Adv. D.I. 191.

[3] Adv. D.I. 184.

[4] Adv. D.I. 174.

## I. JURISDICTION

The Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 1334 and 157(a). Certain Counts of the Complaint are core proceedings while others are non-core. The Trustee demands a jury trial for all Counts of the Complaint. Neither the Trustee nor the Defendants consent to the entry of a final judgment or adjudication by this Court. Nonetheless, the Court has the authority to hear and enter an order on the Motions.[5]

## II. RELEVANT BACKGROUND[6]

### A. *The Prepetition Restructuring and Sale of the Renal Business*

The claims asserted in the Trustee's Complaint spring from a complex prepetition restructuring of Debtor DSI Renal Holdings, LLC ("DSI Renal Holdings") and certain of its subsidiaries (the "Restructuring"). Prior to the Restructuring, non-Debtor DSI Holding Company, Inc. ("DSI Parent") wholly owned the Debtors. DSI Parent's indirect subsidiaries owned substantially all of the operating assets of the enterprise, including kidney dialysis clinics throughout the United States (the "Renal Business"). The Renal Business was owned by non-Debtor DSI Renal, Inc. ("DSI Renal"), a wholly owned subsidiary of Debtor DSI Renal Holdings.

On January 11, 2010, the Restructuring was effectuated through a series of transactions as contemplated by, and set forth in, a Global Restructuring Agreement ("GRA") entered into by, among others, DSI Parent, DSI Parent's equity holders (including Defendants The Northwestern Mutual Life Insurance Company ("NML"), Apollo Investment Corp. ("AIC"), and certain Centre Defendants[7]),[8] DSI Renal Holdings, DSI Renal, and the lenders under DSI Renal's credit facilities

---

[5] *See, e.g.*, *Burtch v. Owlstone, Inc. (In re Advance Nanotech, Inc.)*, No. 13-51215, 2014 WL 1320145, *2 (Bankr. D. Del. Apr. 2, 2014) ("After *Stern v. Marshall*, the ability of bankruptcy judges to enter interlocutory orders in proceedings . . . has been reaffirmed . . . ."); *Boyd v. King Par, LLC*, No. 11-CV-1106, 2011 WL 5509873, at *2 (W.D. Mich. Nov. 10, 2011) ("[U]ncertainty regarding the bankruptcy court's ability to enter a final judgment . . . does not deprive the bankruptcy court of the power to entertain all pretrial proceedings, including summary judgment motions.").

[6] The relevant background set forth in this Opinion is substantially similar to that which is detailed in the Court's Opinion on the *Defendants' Motion For Partial Summary Judgment Limiting Any Recoveries To The Amount Necessary To Satisfy Allowed Creditor Claims* issued on February 4, 2020. *See Giuliano v. Schnabel (In re DSI Renal Holdings, LLC)*, No. 14-50356, 2020 WL 550987, at **1-3 (Bankr. D. Del. Feb. 4, 2020) (the "Capping Opinion").

[7] The Centre Defendants are Centre Partners Management LLC, Centre Bregal Partners, L.P., Centre Bregal Partners II, L.P., Centre Capital Investors IV, L.P., Centre Capital Investors V, L.P., Centre Capital Non-Qualified Investors IV, L.P., Centre Capital Non-Qualified Investors V, L.P., Centre Partners Coinvestment IV, L.P., Centre Partners Coinvestment V, L.P., Centre Partners IV, L.P., Centre Partners IV, LLC, Centre Partners V, L.P., and Centre Partners V, LLC.

[8] As of the Restructuring, DSI Parent issued redeemable preferred stock, convertible preferred stock, and common stock. The redeemable preferred stock was held by NML and AIC. The convertible preferred stock and common stock was held by certain Centre Defendants, NML, and non-Defendant investors.

(including certain Centre Defendants, NML, Ares Capital Corp. ("ARCC"), and AIC).[9] In sum, the following relevant events occurred to effectuate the Restructuring:

- DSI Renal Holdings formed CDSI I Holding Company, Inc. ("CDSI I"), which formed a wholly owned subsidiary, CDSI II Holding Company Inc. ("CDSI II");

- Certain Centre Defendants, AIC, NML, and ARCC converted (the "Creditors") an aggregate of approximately $55 million of their DSI Renal subordinated debt holdings into, among other things, 55,000 DSI Renal shares (the "Debt-for-Equity Exchange") and contributed those DSI Renal shares to CDSI I in return for, among other things, approximately 55,000 CDSI I shares;

- DSI Renal Holdings contributed all of its 1,000 DSI Renal shares (the "Renal Shares") to CDSI I and received, among other things, one CDSI I share;

- Certain Centre Defendants and NML invested (the "Investors") $71 million (the "New Money Investment") into CDSI I for, among other things, approximately 77,000 CDSI I shares;

- CDSI I contributed the Investment Proceeds and 56,000 DSI Renal shares to CDSI II;

- Certain shareholders of DSI Parent received equity interests in CDSI I from the Investors and Creditors; and

- DSI Parent merged with and into DSI Renal Holdings, with DSI Renal Holdings surviving, and the former shareholders of DSI Parent receiving ownership interests in DSI Renal Holdings in the same numbers and series or classes as they held in DSI Parent prior to the Restructuring.

There is no dispute that each of the Restructuring transactions were part of an integrated transaction and that the effectiveness of each transaction was conditioned upon the substantially simultaneous consummation of the other transactions.

As a consequence of the Restructuring, DSI Renal Holdings ceased to wholly own DSI Renal. Rather, DSI Renal and its Renal Business became wholly owned by CDSI I, indirectly through its subsidiary CDSI II. DSI Renal Holdings held one share of CDSI I. Defendants Centre Defendants, NML, ARCC, and AIC, along with other non-defendants, held the remainder.

---

[9] Prior to the Restructuring, DSI Renal's outstanding obligations under its credit facilities totaled approximately $464 million. More specifically, approximately $282 million, $169 million, and $12 million were outstanding under the Existing Senior Secured Credit Agreement, the Senior Subordinated Loan Agreement, and the Junior Subordinated Loan Agreement (as such terms are defined in the GRA), respectively. Certain Centre Defendants, ARCC, AIC, and NML were lenders under the senior subordinated facility. NML was the lender under the junior subordinated facility.

A little over one year later, DaVita, Inc. ("DaVita"), a third-party who is not a Defendant, entered into a merger agreement with CDSI I. DaVita acquired CDSI I for approximately $689 million (the "DaVita Acquisition"). The Defendants received in the aggregate approximately $440 million on account of, among other things, their shares in CDSI I and the outstanding debt obligations owed to them by DSI Renal (the "Debt Repayments").

### B.    *The Bankruptcy Proceedings*

On June 3, 2011 (the "Petition Date"), each of the Debtors filed in this Court voluntary petitions for relief under chapter 7 of title 11 of the United States Code (the "Bankruptcy Code"). The Trustee was appointed as the chapter 7 trustee for the Debtors' estates and, on May 20, 2013, commenced this proceeding in the United States District Court for the Eastern District of Pennsylvania. Ultimately, it was transferred to the United States District Court for the District of Delaware and referred to this Court.

The gravamen of the Trustee's Complaint is that the Defendants – Messrs. Schnabel, Murphy, Pollack, Bergmann, and Yalowitz (together, the "D&O Defendants") (former officers and directors of entities affiliated with DSI Renal Holdings) and the Centre Defendants, NML, AIC, and ARCC – effectuated a fraudulent scheme leading up to and through the Restructuring that stripped the Debtors of substantially all of their valuable assets, namely the Renal Business, for little to no consideration and then turned around and sold those assets for over half a billion dollars. According to the Trustee, while the Defendants received hundreds of millions of dollars for their wrongful activity, the Debtors and their creditors were left with little except millions of dollars' worth of non-insider claims. On account of this alleged wrongful activity, the Trustee has asserted claims for the avoidance and recovery of fraudulent transfers as well as claims arising from breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and corporate waste.[10]

The Defendants contest the Trustee's claims and allegations. However, the Court need not address issues of ultimate liability at this stage. Rather, the Damages Motions relate only to the extent of damages sought by the Trustee, and the Safe Harbor Motion relates only to the application of section 546(e) of the Bankruptcy Code to the Trustee's constructive fraudulent transfer claims against NML raised in Counts 2, 3, and 4. Briefing on the Motions is complete, oral argument was held on September 13, 2019, and the matters are ripe for decision.

---

[10] The Complaint as filed alleged nine counts against some or all of the Defendants plus CDSI I, CDSI II, and Ken Kencel. The Trustee voluntarily dismissed without prejudice CDSI I and CDSI II on August 2, 2013 and Mr. Kencel on November 1, 2013. Motions to dismiss were filed in August 2013. During oral argument on the motions, the Trustee voluntarily withdrew without prejudice Count 9 of the Complaint. The Court issued its Opinion on the dismissal motions on July 20, 2017, granting, denying, or deferring them in part. *Giuliano v. Schnabel (In re DSI Renal Holdings, LLC)*, 574 B.R. 446 (Bankr. D. Del. 2017).

As a result of the foregoing, seven counts remain against some or all of the Defendants. More specifically, Counts 1-4, alleged against all Defendants, seek the avoidance and recovery of alleged fraudulent transfers under 11 U.S.C. § 548(a)(1)(A), 11 U.S.C. § 548(a)(1)(B), 11 U.S.C. § 544 and 6 Del. C. §§ 1304 and 1305, and 11 U.S.C. § 550, respectively. Count 5, alleged against the D&O Defendants and the Centre Defendants, asserts claims for breach of fiduciary duty. Count 6, alleged against all Defendants, asserts claims for aiding and abetting breach of fiduciary duty. The final remaining count, Count 7, alleged against all D&O Defendants except Mr. Yalowitz, asserts claims for corporate waste.

4

### III. LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure, made applicable to this proceeding by Rule 7056 of the Federal Rules of Bankruptcy Procedure, provides that a court may grant summary judgment on whole or in part of a claim or defense "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[11]  A material fact is one that "might affect the outcome of the suit under governing law." [12]  A dispute concerning a material fact is present "when reasonable minds could disagree on the result."[13]  The moving party bears the burden of demonstrating an entitlement to summary judgment.[14]

Summary judgment serves to "isolate and dispose of factually unsupported claims or defenses" and avoid unnecessary trial where the facts are settled.[15]  Thus, at the summary judgment stage, the court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.[16]  A court should view the facts and all permissible inferences from those facts in the light most favorable to the non-moving party.[17]  Any doubt must be construed in the non-moving party's favor.[18]

A moving party bears the initial burden of demonstrating the absence of a dispute of material fact.[19]  "[W]hen the moving party has met its burden . . . the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial."[20]  In other words, "the mere existence of some alleged factual dispute between the parties" cannot defeat a properly supported summary judgment motion.[21]  Rather, the dispute must relate to a genuine issue of material fact.[22]  Thus, a non-moving party cannot defeat a summary judgment motion based on conclusory allegations and denials, but instead must provide supportive arguments or facts that show the necessity of a trial.[23]

---

[11] FED. R. CIV. P. 56(a).

[12] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[13] *In re Delta Mills, Inc.,* 404 B.R. 95, 105 (Bankr. D. Del. 2009).

[14] *Gans v. Mundy*, 762 F.2d 338, 340-41 (3d Cir. 1985).

[15] *Delta Mills*, 404 B.R. at 104 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)).

[16] *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 482 (3d Cir. 2001) (citing *Celotex*, 477 U.S. at 317); *see also* FED. R. CIV. P. 56(c).

[17] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

[18] *Delta Mills*, 404 B.R. at 105.

[19] *Celotex*, 477 U.S. at 323.

[20] *Matsushita*, 475 U.S. at 586-87.

[21] *Anderson*, 477 U.S. at 247-48.

[22] *Delta Mills*, 404 B.R. at 105.

[23] *Schoch v. First Fidelity Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990).

Summary judgment should be granted if, after drawing all reasonable inferences from the underlying facts in the light most favorable to the non-moving party, the court concludes that there is no genuine issue of material fact to be resolved at trial and the moving party is entitled to judgment as a matter of law.[24]

## IV.  LEGAL DISCUSSION

### A.  The Damages Motions

In this proceeding, the Trustee challenges the transfer of CDSI I stock to the Defendants in the Restructuring. This stock, according to the Trustee, represents the Renal Shares allegedly fraudulently transferred by DSI Renal Holdings. However, because DaVita purchased the stock of CDSI I in the DaVita Acquisition, the Trustee acknowledges that it cannot be recovered if he should prevail on his claims. He, therefore, seeks as damages to recover all amounts received by each Defendant in the DaVita Acquisition plus prejudgment interest. In support, the Trustee argues, among other things, that this Court must consider the overall effect of the integrated Restructuring when awarding damages to return DSI Renal Holdings to its pre-Restructuring state as the sole owner of DSI Renal and its Renal Business.[25] As explained by Trustee's counsel during oral argument: "[DSI Renal Holdings] owned a business, it was taken away, [the Trustee] wants the business back. Since he can't get the business, [because] it was sold, he wants the proceeds of the sale."[26]

The Defendants disagree with, and ask this Court to limit, the extent of damages pursued by the Trustee. More specifically, through the Stock Motion, the Defendants[27] ask this Court to hold that the Trustee cannot recover the value of CDSI I stock attributable to their contributions to the Restructuring, *i.e.* the New Money Investment and the Debt-for-Equity Exchange. They also ask this Court to hold, through the Debt Motion, that the Trustee cannot recover amounts that they received in the DaVita Acquisition that were on account of DSI Renal's liabilities and not on account of CDSI I stock (the "Non-Stock Proceeds"). These amounts include the Debt Repayments as well as a transaction fee received by certain Centre Defendants.

If the Trustee prevails on his fraudulent transfer claims, it is black-letter law that the scope of his recovery under section 550 of the Bankruptcy Code is limited to the property of the Debtors

---

[24] FED. R. CIV. P. 56(a).

[25] The Trustee has submitted several other arguments for the Court's consideration in opposition to the Damages Motions. The Court has taken all of these arguments into account when reaching its conclusions but has addressed herein only those that raise serious concerns. Arguments that the Court has not addressed are rejected.

[26] Sept. 13, 2019 Hr'g Tr. at 45:15-21, Adv. D.I. 241; *see also e.g.*, *id.* at 36:5-37:1.

[27] The relief requested in the Stock Motion has been requested by all of the Defendants whereas the relief requested in the Debt Motion has been requested only by AIC, ARCC, and NML. For ease of reference, the Court will refer to the movants collectively as the Defendants.

that was fraudulently transferred or the value thereof,[28] with the goal of restoring the Debtors' estates to the position they would have enjoyed if the transfer had not occurred.[29] The same applies to the Trustee's state law claims.  Under Delaware law,[30] courts have broad discretion to fashion appropriate remedies based on the facts and circumstances present.[31]  In doing so however, case law indicates that the Court should seek to restore the status quo in existence prior to the challenged transaction, focusing on the loss suffered by the Debtors as the injured parties.[32]  These basic principles have led the Court to agree with the Defendants that the extent of damages sought by the Trustee is too broad and must be limited as requested.

---

[28] 11 U.S.C. § 550(a) ("[T]o the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of [the Bankruptcy Code], the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property . . . .").

[29] *See, e.g.*, 11 U.S.C. § 548(a)(1) (The trustee may avoid any transfer . . . of an *interest of the debtor in property*. . . . (emphasis added)); *see also Crystallex Int'l Corp. v. Petróleos De Venezuela, S.A.*, 879 F.3d 79, 84-89 (3d. Cir. 2018) (holding that plaintiff's Delaware state law fraudulent transfer claim failed and noting, "Absent is any allegation that . . . the only potential debtors . . . transferred any property. . . . . [T]his transaction seems to lack the principal harm visited upon creditors in a fraudulent transfer, namely the debtor's alienation of an asset otherwise available to pay its debts."); *In re PWS Holding Corp.*, 303 F.3d 308, 313 (3d Cir. 2002) ("Fraudulent conveyance law aims 'to make available to creditors those assets of the debtor that are rightfully a part of the bankruptcy estate, even if they have been transferred away.'" (quoting *Buncher Co. v. Official Comm. of Unsecured Creditors of GenFarm Ltd. P'ship IV*, 229 F.3d 245, 250 (3d Cir. 2000)); *Official Comm. of Unsecured Creditors of HH Liquidation, LLC v. Comvest Grp. Holdings, LLC (In re HH Liquidation, LLC)*, 590 B.R. 211, 261 (Bankr. D. Del. 2018) ("Fraudulent transfer is a statutory remedy that allows creditors to avoid transfers and return property to a debtor that originally owned it."); 5 COLLIER ON BANKRUPTCY ¶ 548.03[2][a] (16th ed.) ("[N]ot all transfers are with section 548's scope; only those that affect property that would have been property of the estate but for the transfer. The organizing principle behind this view is that creditors' recoveries are affected only by those transfers which touch on property that would have been available for distribution to creditors have the debtor not parted with the interest.").

[30] As discussed in the Capping Opinion, Delaware law applies to the Trustee's state law claims.  *See* Capping Opinion at 9 & n.61.

[31] *Weinberger v. UOP, Inc.*, 457 A.2d 701, 714 (Del. 1983) ("the [court's] powers are complete to fashion any form of equitable and monetary relief as may be appropriate . . . .").

[32] *See, e.g.*, *Basho Techs. Holdco B, LLC v. Georgetown Basho Inv'rs, LLC*, No. 11802-VCL, 2018 WL 3326693, at *50 (Del. Ch. July 6, 2018) ("Damages must be 'logically and reasonably related to the harm or injury for which compensation is being awarded."); *Ravenswood Inv. Co. v. Winmill*, No. 3730-VCS, 2018 WL 1410860, at *19 (Del. Ch. Mar. 22, 2018) ("[I]n cases where the court has found a breach of the duty of loyalty, recovery is 'not to be determined narrowly.'  To be sure, in these circumstances, 'potentially harsher rules come into play.'  But the Court still must have some basis in the evidence upon which to grant relief." (quoting *Thorpe v. CERBCO, Inc.*, 676 A.2d 436, 445 (Del. 1996) and *Bomarko, Inc. Int'l Telecharge, Inc.*, 794 A.2d 1161, 1184 (Del. Ch. 1999)); *In re Orchard Enters., Inc. S'holder Litig.*, 88 A.3d 1, 38-39 (Del. Ch. 2014) ("In a case where a disloyal fiduciary wrongfully deprives its beneficiary of property, the rescissory damages measure seeks (i) to restore the plaintiff-beneficiary to the position it could have been in had the plaintiff or a faithful fiduciary exercised control over the property in the interim and (ii) to force the defendant to disgorge profits that the defendant may have achieved through the wrongful retention of the plaintiff's property.").

The Debtors did not have a right to or any other property interest in the contributions made by the Defendants to the Restructuring or in the DSI Renal debt owed to the Defendants at the time of the DaVita Acquisition. Similarly, the Debtors had no right to or any other property interest in the DaVita funds used to acquire the CDSI I shares issued to the Defendants on account of their contributions or those funds representing the Non-Stock Proceeds. Given these facts, the value of the CDSI I shares attributable to the Defendants' contributions as well as the Non-Stock Proceeds are not on account of lost Debtor property. As such, they are neither recoverable under section 550 nor relevant to the Trustee's measure of damages if the Court determines that there was a fraudulent transfer of the Debtors' property.[33] In this instance, the Renal Shares will be the focus as the particular Debtor property transferred.[34]

The fact that the multiple steps of the Restructuring are collapsible into one integrated transaction does not affect the Court's conclusions. In analyzing a fraudulent transfer claim where there are multiple transactions, courts may collapse the steps, exchanges, and transactions that are "part of one integrated transaction" to examine the substance, rather than the form, of the transactions.[35] Although the individual parts that make up the collapsed transaction remain distinct, the collapsing doctrine allows courts to infer facts, intent, and notice gleaned from one part of a transaction into another to, among other things, "slice through complicated transactions to compare what value the debtor gave and what value the debtor got."[36] Contrary to the Trustee's

---

[33] As aptly analogized by counsel for the Centre Defendants during oral argument on the Stock Motion: "[S]uppose the debtors got a car and my briefcase [was] in the trunk. And then the debtor fraudulently transfers the car to me. What is the trustee allowed to recover? He gets the car. He doesn't get the briefcase that I left in the trunk. . . . He's allowed to get back what he owned in the first place, not what was combined with my assets."). Sept. 13, 2019 Hr'g Tr. at 91:11-18. *See also id.* at 103:17-19 (referring to the Debt Repayments and the like as "transfers by nondebtors to nondebtors to repay the debt of a nondebtor.").

[34] To be clear, as acknowledged by the Defendants, if it is ultimately determined that DSI Renal Holdings did not receive the correct proportion of CDSI I stock as consideration for its contribution of the Renal Shares, then the Defendants necessarily received too much CDSI I stock for their contributions and the Trustee may seek to recover the DaVita proceeds received by the Defendants on account of the excessive CDSI I stock they held. In this circumstance, all parties' rights are reserved.

[35] *United States v. Tabor Court Realty Corp.*, 803 F.2d 1288, 1302 (3d Cir. 1986); *see also Liquidation Trust of Hechinger Inv. Co. of Del., Inc. v. Fleet Retail Fin. Grp. (In re Hechinger Inv. Co. of Del.)*, 327 B.R. 537, 547 (D. Del. 2005); *Official Comm. of Unsecured Creditors v. CIT Grp./Business Credit, Inc.* (*In re Jevic Holding Corp.)*, No. 08-11006, 2011 WL 4345204, at *5 (Bankr. D. Del. Sep. 15, 2011); *Mervyn's LLC v. Lubert-Adler Grp. IV, LLC (In re Mervyn's Holdings, LLC)*, 426 B.R. 488, 497-98 (Bankr. D. Del. 2010); *Rosener v. Majestic Mgmt., Inc. (In re OODC, LLC)*, 321 B.R. 128, 138 (Bankr. D. Del. 2005).

[36] 5 COLLIER ON BANKRUPTCY ¶ 548.03[6], at 548-57 (16th ed.) (*citing*, *inter alia*, *Voest-Alpine Trading USA Corp. v. Vantage Steel Corp.*, 919 F.2d 206 (3d Cir. 1990) and *Orr v. Kinderhill Corp.*, 991 F.2d 31, 35 (2d Cir. 1994)); *see also Tabor*, 803 F.2d at 1302 (finding the district court to have properly examined each part of a collapsed transaction and applied facts from one part to another in rendering its decision that, among other things, obligations incurred by the debtors in a leveraged buyout were not supported by fair consideration); *In re Sabine Oil & Gas Corp.*, 547 B.R. 503, 540-41 (Bankr. S.D.N.Y. 2016) ("[A] proper application of the collapsing doctrine . . . requires collapsing all transfers that are part of a single plan and viewing that single plan as a whole, with all its composite implications, for reasonably equivalent value and otherwise."); *DSI Renal*, 574 B.R. at 466-68 (noting that, given the Restructuring was asserted to be integrated, the fact that the challenged transferred property was CDSI stock was not fatal to the Trustee's

8

contentions, collapsing the Restructuring transactions for these purposes does not expand the property rights of the Debtors such that the Trustee may recover property (or the value thereof) to which the Debtors were never entitled pre-Restructuring.[37]

Accordingly, the Court will grant the relief requested in the Damages Motions and hold that the Trustee cannot recover (1) the value of CDSI I stock attributable to the contributions of the Defendants and (2) the Non-Stock Proceeds.

### B.    Safe Harbor Motion

Section 546(e) places a limitation on the exercise of avoidance powers that is commonly referred to as the "securities safe harbor". It provides, in pertinent part, that:

> Notwithstanding sections 544 . . . [and] 548(a)(1)(B) . . . of [the Bankruptcy Code], the trustee may not avoid a transfer that is a . . . settlement payment, as defined in section 101 or 741 of [the Bankruptcy Code], made by or to (or for the benefit of) a . . . financial participant . . ., or that is a transfer made by or to (or for the benefit of) a . . . financial participant . . . in connection with a securities contract, as defined in section 741(7) . . ., that is made before the commencement of the case, except under section 548(a)(1)(A) of [the Bankruptcy Code].[38]

Through the Safe Harbor Motion, NML requests that the Court enter summary judgment in its favor pursuant to section 546(e) on the Trustee's claims that seek to avoid and recover alleged constructively fraudulent transfers pursuant to sections 544 and 548(a)(1)(B) of the Bankruptcy Code and applicable Delaware law. In support, NML argues that it qualifies as a financial participant and that the challenged transfers it received in the Restructuring (*i.e.* the CDSI I stock) were either settlement payments (*i.e.* stock received in exchange for the New Money Investment and Debt-for-Equity Exchange in order to complete a securities transaction) or made in connection with a securities contract (*i.e.* the GRA).

---

fraudulent transfer claims on a motion to dismiss because the stock could represent property of the Debtors transferred through an intermediary).

[37] *See, e.g.*, *HH Liquidation*, 590 B.R. at 269 ("Collapsing a transaction is not the same thing as a finding of fraudulent transfer; it is merely a tool to allow the Court to view the overall economic effect of a transfer. After a court collapses a transaction, it still needs to apply traditional fraudulent transfer rules to see if there was any fraudulent transfer. . . . Collapsing the transactions does not save the Committee's claims because at no intermediate step of any of the transactions did OpCo ever have any interest in the real property.").

[38] 11 U.S.C. § 546(e).

9

The record and existing case law supports NML's contentions[39] and, indeed, the Trustee does not dispute them.[40] The Trustee, however, asserts that the securities safe harbor does not apply to NML because the Restructuring was (1) an integrated, collapsible transaction, (2) effectuated with actual intent to hinder, delay, and defraud the Debtors' creditors, and (3) one-sided and unfair.[41] The Court does not agree.

---

[39] *See, e.g.*, *Decl. of Todd C. Kuzminski*, Adv. D.I. 176 (attaching NML's audited financial statements for the calendar years ending December 31, 2011 and 2010 in support of its qualifications as a "financial participant" pursuant to the definition set forth in 11 U.S.C. § 101(22A)(A)); *Lowenschuss v. Resorts Int'l, Inc. (In re Resorts Int'l, Inc.)*, 181 F.3d 505, 515 (3d Cir. 1999) (holding that the definition of "settlement payment" is broad and that "[i]n the securities industry, a settlement payment is generally the transfer of cash or securities made to complete a securities transaction."); *Brandt v. B.A. Capital Co. LP (In re Plassein Int'l. Corp.)*, 590 F.3d 252 (3d Cir. 2009) (refusing to distinguish privately-held securities from those publicly-traded when determining settlement payments); *In re Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*, 651 F.3d 329, 336-38 (2d Cir. 2011) (determining that redemption payments were settlement payments); *Buchwald Capital Advisors, LLC v. Papas (In re Greektown Holdings, LLC)*, No. 10-05712, 2015 WL 8229658, at *5 (Bankr. E.D. Mich. Nov. 24, 2015) (holding that the exchange of notes and money qualified as a settlement payment), *vacated on other grounds by* 765 Fed. App'x 132 (6th Cir. 2019); *Picard v. Ida Fishman Revocable Trust (In re Bernard L. Madoff Inv. Secs. LLC)*, 773 F.3d 411, 418 (2d Cir. 2014) (examining the definition of "securities contract" set forth in 11 U.S.C. § 741(7) and explaining that the term "expansively includes contracts for the purchase or sale of securities, as well as any agreements that are *similar* or *related* to contracts for the purchase or sale of securities.").

[40] While the Trustee argues that the application of section 546(e) is a fact-intensive inquiry not appropriate for summary judgment, the cases he cites in support are inapplicable as they address section 546(e) at the motion to dismiss stage. *See FTI Consulting, Inc. v. Sweeney (In re Centaur, LLC)*, No. 10-10799, 2013 WL 4479074, at *4 (Bankr. D. Del. Aug. 19, 2013) (denying defendants' motion to dismiss action to avoid alleged constructively fraudulent transfers, holding that "Whether the § 546(e) safe harbor applies to the transfers in question also requires a determination of fact and is not suitable for disposition on a motion to dismiss . . . ."); *Zazzali v. AFA Fin. Grp., LLC*, No. 10-54524, 2012 WL 4903593, at *11 (Bankr. D. Del. Aug. 28, 2012) ("[I]t is premature to dismiss this count on the basis of the 546(e) defense. The application of the defense is a fact-based inquiry."). Moreover, as contemplated by Rule 56 of the Federal Rules of Civil Procedure, once a "moving party successfully points to evidence of all of the facts needed to decide the case on the law short of trial, the non-moving party can defeat summary judgment if it nonetheless produces or points to evidence in the record that creates a genuine issue of material fact. The non-moving party cannot rest on mere pleadings or allegations; rather it must point to actual evidence in the record on which a jury could decide an issue of act its way." *El v. Southeastern Penn. Transp. Auth.*, 479 F.3d 232, 238 (3d Cir. 2007). "[S]ummary judgment is essentially 'put up or shut up' time for the non-moving party . . . ." *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006) (quoting *Jersey Cent. Power & Light Co. v. Lacey Twp.*, 772 F.2d 1103, 1109-10 (3d Cir. 1985)).

[41] At oral argument, counsel for the Trustee argued for the first time that NML is not entitled to the securities safe harbor because, although it met the definition of a financial participant under the Bankruptcy Code, it did not act as one during the Restructuring. Instead, according to the Trustee, it acted as a mere investor of its own funds. The Trustee offered no factual or legal theory in support except for the United States Supreme Court's decision in *Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 138 S. Ct. 883 (2018). However, *Merit* does not stand for such a proposition. Rather, among other things, it emphasizes the importance of applying the safe harbor criteria as set forth and defined in the Bankruptcy Code to a challenged transaction, which has occurred here.

First, NML does not seek summary judgment under section 546(e) on the Trustee's claims to avoid and recover alleged actual fraudulent transfers. It only seeks application of the securities safe harbor to the Trustee's constructively fraudulent transfer claims, which is expressly permitted by the Bankruptcy Code. Therefore, while the Trustee is concerned that the objectives of section 546(e) would be undermined if the Safe Harbor Motion is granted because "the record establishes that Defendants stripped out the Renal Business for their own benefit with the actual intent to hinder, delay and defraud the Debtors' creditors,"[42] the Trustee is still entitled to pursue such theory following this Court's approval of the relief sought by NML.

Second, the collapsing of the Restructuring's multiple integrated transactions does not preclude NML's use of the securities safe harbor.[43] Rather, as explained, it serves to assist its application.[44] For instance, as explained by the United States Supreme Court in *Merit Management Group, LP v. FTI Consulting, Inc.*, when applying the securities safe harbor in the context of a transfer that is executed via one or more transactions, "the only relevant transfer for purposes of the safe harbor is the transfer that the trustee seeks to avoid."[45] Accordingly, the first step in a section 546(e) analysis is to "identify the relevant transfer" so that a determination may be made as to whether the covered transaction and entity criteria of the securities safe harbor are met.[46] Here, the Trustee took advantage of the collapsing doctrine when he identified the relevant transfers. He has identified them as those transfers of CDSI I stock made to the Defendants in the Restructuring. Rather than focusing on the single step of the Restructuring in which DSI Renal Holdings transferred to CDSI I all of its Renal Shares, the Trustee has linked the Restructuring's multi-steps together, examined their significance, and has pursued the Defendants for an "overarching transfer"[47] – their alleged receipt of the Renal Shares as represented by the CDSI I stock. This transfer, as framed by the Trustee using the collapsing doctrine, has served as the starting point for NML's section 546(e) defense, which has been applied using the facts and circumstances of the Restructuring as a whole.[48]

---

[42] *Trustee's Omnibus Mem. in Opp. to Defs.' Mots. for Summ. J.* at 106, Adv. D.I. 205.

[43] In support, the Trustee cites the court in *Mervyn's*, which stated that "as a general rule, section 546(e) does not apply to 'collapsed' transactions." 426 B.R. at 500. However, that court later clarified in *HH Liquidation* that collapsing is merely a tool to aid in the application of fraudulent transfer law and does eliminate or modify elements necessary to establish liability. *See supra* note 37. Moreover, as noted by the Defendants, other courts have applied section 546(e) to collapsed transactions. *See generally In re Crescent Res. Litig. Trust v. Duke Energy Corp.*, 500 B.R. 464 (W.D. Tex. 2013); *Official Comm. of Unsecured Creditors of Nat'l Forge Co. v. Clark (In re Nat'l Forge Co.)*, 344 B.R. 340 (W.D. Pa. 2006).

[44] *See supra* Legal Discussion, Part A.

[45] 138 S. Ct. at 888 (applying section 546(e) to a multi-step transfer involving intermediary financial institutions).

[46] *Id.* at 893.

[47] *Id.*

[48] *See, e.g.*, *In re Crescent Res. Litig. Trust v. Duke Energy Corp.*, 500 B.R. at 474 (refusing to analyze one part of a multi-faceted transaction in isolation for purposes of a section 546(e) analysis and instead holding that it "should be viewed in the context of the entire transaction.").

Third and finally, the Court agrees with the Defendants that the cases cited by the Trustee do not support the existence of a carveout from section 546(e) for unfair or one-sided transactions. Rather, the cases cited – *Michaelson v. Farmer (In re Appleseed's Intermediate Holdings, LLC)* and *Mervyn's LLC v. Lubert-Adler Grp. IV, LLC (In re Mervyn's Holdings, LLC)*,[49] – found that the statutory requirements of section 546(e) were not met based on the specific facts and circumstances presented. Those cases, however, are distinguishable[50] and, for reasons already explained, the statutory requirements of section 546(e) have been met with respect to NML.

Accordingly, the Court will grant the relief requested by NML in the Safe Harbor Motion and enter summary judgment in its favor on Counts 2 and 3 and related partial summary judgment on Count 4.

### V. CONCLUSION

For the reasons set forth herein, the Court finds that the Defendants have met their burden under Rule 56 of the Federal Rules of Civil Procedure and will grant the relief requested in the Motions as set forth herein. An appropriate order will follow.

Dated: March 30, 2020

_____
Karen B. Owens
United States Bankruptcy Judge

---

[49] *Michaelson v. Farmer (In re Appleseed's Intermediate Holdings, LLC)*, 470 B.R. 289, 302 (D. Del. 2012) (finding at the motion to dismiss stage that section 546(e) could not be applied automatically to a dividend payment made in connection with a leverage buyout because the debtors did not receive anything in exchange); *Mervyn's*, 426 B.R. at 500 (determining at the motion to dismiss stage that, based on the facts as alleged, section 546(e) could not be applied to a single step of an integrated multi-part transaction when debtor assets were transferred in another step for virtually no consideration).

[50] Among other things, the Restructuring is fundamentally different than the challenged transactions in *Appleseed's* and *Mervyn's*. Moreover, the record indicates that value was given to DSI Renal Holdings for the Renal Shares, and that the Court's analysis of the Restructuring will, in part, focus on whether such value was sufficient.